IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

JIMMY EUGENE COLESON,
      Petitioner,

vs.                                   Case No.:  3:12cv96/MCR/EMT

MICHAEL D. CREWS,[1]
      Respondent.
_____/

## ORDER and REPORT AND RECOMMENDATION

This cause is before the court on Petitioner's amended petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (doc. 10). Respondent filed an answer and relevant portions of the state court record (doc. 26). Petitioner filed a reply (doc. 29).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After careful consideration of all issues raised by Petitioner, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rules Governing Section 2254 Cases 8(a). It is further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.      BACKGROUND AND PROCEDURAL HISTORY

---

[1] Michael D. Crews succeeded Kenneth S. Tucker as Secretary for the Department of Corrections, and is automatically substituted as Respondent. *See* Fed. R. Civ. P. 25(d).

The relevant aspects of the procedural background of this case are established by the state court record (*see* doc. 26).[2] Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2006-CF-1486, with one count of DUI manslaughter (Count 1) and one count of DUI with damage to property or person (Count 2) (Ex. C). Following a jury trial in January of 2008, he was found guilty as charged (Exs. F, G). On February 29, 2008, Petitioner was sentenced to 124.8 months of imprisonment, with pre-sentence jail credit of 342 days, on Count 1, and a consecutive term of one year of probation on Count 2 (Exs. H, I).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D08-1199 (Exs. J, K). The First DCA affirmed the judgment per curiam without written opinion on March 3, 2009, with the mandate issuing April 30, 2009 (Ex. N). Coleson v. State, 6 So. 3d 55 (Fla. 1st DCA 2009) (Table). Petitioner did not seek further review.

On January 4, 2010, Petitioner filed a motion for postconviction relief, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. P). In an order rendered May 20, 2010, the state circuit court struck the motion as facially insufficient, without prejudice to Petitioner's filing an amended motion "within a reasonable time" (Ex. Q). Petitioner filed an amended motion on June 17, 2010, and second amended motion on September 2, 2010 (Exs. R, T). In an order rendered January 6, 2011, the state circuit court struck both motions as facially insufficient, without prejudice to Petitioner's filing an amended motion within thirty (30) days (Ex. W). Petitioner filed a third amended motion on January 27, 2011, and a "supplement" adding one claim on February 16, 2011 (Exs. Y1, Z). The state circuit court summarily denied the motion on June 28, 2011 (Ex. AA). Petitioner appealed the decision to the First DCA, Case No. 1D11-4174 (Exs. BB, CC). The First DCA affirmed the judgment per curiam without written opinion on February 7, 2012, with the mandate issuing March 6, 2012 (Ex. EE). Coleson v. State, 79 So. 3d 22 (Fla. 1st DCA 2012) (Table).

---

[2] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (doc. 26). If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Case No.: 3:12cv96/MCR/EMT

On July 1, 2010, Petitioner filed a habeas petition in the First DCA, Case No. 1D10-3541, alleging ineffective assistance of appellate counsel (Ex. X). The First DCA denied the petition on the merits on July 23, 2010 (*id.*). Coleson v. State, 41 So. 3d 356 (Fla. 1st DCA 2010) (Mem).

Petitioner filed the instant federal habeas action on February 27, 2012 (doc. 1). Respondent does not assert a statute of limitations defense (doc. 26 at 6).

II.    STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States. As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). Pub.L. 104-132, § 104, 110 Stat. 1214, 1218–19. In relevant part, section 2254(d) now provides:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[3] The appropriate test was described by Justice O'Connor as follows:

---

[3] Unless otherwise noted, references to Williams are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13). The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court.  Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); Ramdass v. Angelone, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000).  In employing this test, the Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal State court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision."  Lockyer v. Andrade, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case."  Neelley v. Nagle, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds by* Parker v. Head, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the State court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'"  Lockyer, 538 U.S. at 73 (quoting Williams, 529 U.S. at 405–06).  The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."

Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting Williams, 529 U.S. at 405–06). If the State court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If on the other hand, the State court applied the correct Supreme Court precedent and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must go to the third step and determine whether the State court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." Williams, 529 U.S. at 409. Whether a State court's decision was an unreasonable application of a legal principle must be assessed in light of the record the court had before it. Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); cf. Bell v. Cone, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the State court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." Putman v. Head, 268 F.3d 1223, 1241 (11th Cir. 2001). "In determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review 'may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.'" Gill v. Mecusker, 633 F.3d 1272, 1287 (11th Cir. 2011) (quoting Williams, 529 U.S. at 411) (citing Harrington v. Richter, — U.S. —, 131 S. Ct. 770, 786–87, 178 L. Ed. 2d 624 (2011)). The AEDPA's "unreasonable application" standard focuses on the state court's ultimate conclusion, not the reasoning that led to it. See Gill, supra at 1291 (citing Harrington, 131 S. Ct. at 786). Under § 2254(d), a habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the

Supreme Court. *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, *supra,* at 1292 (the federal district court may rely on grounds other than those articulated by the state court in determining that habeas relief was not warranted, so long as the district court did not err in concluding that the state court's rejection of the petitioner's claims was neither an unreasonable application of a Supreme Court holding nor an unreasonable determination of the facts).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in State court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum).

When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g.* <u>Miller-El</u>, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); <u>Jones v. Walker</u>, 469 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact."). The "unreasonable determination of the facts" standard is only implicated to the extent that the validity of the state court's ultimate conclusion is premised on unreasonable fact finding. *See* <u>Gill</u>, 633 F.3d at 1292. A petitioner is not entitled to relief unless he demonstrates by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision. *Id.*

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the

petitioner's claims. *See* <u>Panetti v. Quarterman</u>, 531 U.S. 930, 953, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); <u>Jones</u>, 469 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a).

III.    EXHAUSTION AND PROCEDURAL DEFAULT

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner have exhausted available state court remedies, 28 U.S.C. § 2254(b)(1),[4] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)). To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim. <u>Duncan</u>, 513 U.S. at 365–66; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999); <u>Picard</u>, 404 U.S. at 277–78.

The Supreme Court has provided lower court with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement. In <u>Picard v. Connor</u>, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277. In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court

---

[4] Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
      (A)  the applicant has exhausted the remedies available in the courts of the State; or
      (B) (i)  there is an absence of available State corrective process; or
          (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

rejected the contention in that case that the petitioner satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. Anderson v. Harless, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In Anderson, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing Sandstrom v. Montana, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." Anderson, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Id., 459 U.S. at 7 and n.3. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. Id.

Years later, the Supreme Court readdressed the "fair presentation" requirement in Duncan v. Henry, 513 U.S. 364. The Duncan Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review of the issue.[5] The Supreme Court explained, "[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." Duncan, 513 U.S. at 365–66. More recently, the Supreme Court again focused upon the requirement of "fair

---

[5] The petitioner in Duncan raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal. Presented with a state constitutional claim, the state court applied state law in resolving the appeal. 513 U.S. at 366.

presentation," holding that "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." Baldwin v. Reese, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004). In Baldwin, the Supreme Court recognized that "[a] litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Id., 541 U.S. at 32. This language, while not part of the Court's holding, provides helpful instruction. With regard to this language, the Eleventh Circuit explained in McNair v. Campbell, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion. However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'" McNair [v. Campbell], 315 F. Supp. 2d at 1184 (quoting Vasquez v. Hillery, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)). This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

416 F.3d at 1302-03 (citations omitted).[6]

The Eleventh Circuit, prior to Duncan, had broadly interpreted the "fair presentation" requirement. After Duncan, however, the Eleventh Circuit has taken a more narrow approach. For example, in Zeigler v. Crosby, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003).

---

[6] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." McNair v. Campbell, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief, but relied on state law for his arguments. Id.

The Eleventh Circuit specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. *Id.* at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

An issue that was not properly presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, that is, procedurally barred from federal review. *See* O'Sullivan, 526 U.S. at 839–40, 848; Bailey v. Nagle, 172 F.3d 1299, 1302–03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *See* Coleman v. Thompson, 501 U.S. 722, 734–35 and n.1, 111 S. Ct. 2546, 2555 and n.1, 115 L. Ed. 2d 640 (1991); Caniff v. Moore, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); Chambers v. Thompson, 150 F.3d 1324, 1326–27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord* Tower v. Phillips, 7 F.3d 206, 210 (11th Cir. 1993); Parker v. Dugger, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L. Ed. 2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. Bailey, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See* Harris v. Reed, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. Lee v. Kemna, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed. 2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," Siebert v. Allen, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or

unprecedented fashion," <u>Judd v. Haley</u>, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. <u>Ford v. Georgia</u>, 498 U.S. 411, 424–25, 111 S. Ct. 850, 858, 112 L. Ed. 2d 935 (1991); <u>Upshaw v. Singletary</u>, 70 F.3d 576, 579 (11th Cir. 1995).

The Eleventh Circuit has set forth a three-part test to determine whether a state court's procedural ruling constitutes an independent and adequate state rule of decision. <u>Judd v. Haley</u>, 250 F.3d 1308, 1313 (11th Cir. 2001). First, the last state court rendering judgment must clearly and expressly state it is relying on state procedural rules to resolve the federal claim.[7] Second, the state court's decision on the procedural issue must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. Third, the state procedural rule must be adequate. *Id.* The adequacy requirement has been interpreted to mean the rule must be firmly established and regularly followed, that is, not applied in an arbitrary or unprecedented fashion. *Id.*

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, the petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." <u>McCleskey v. Zant</u>, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting <u>Murray v. Carrier</u>, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed. 2d 397 (1986)). To satisfy the miscarriage of justice exception, the petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." <u>Schlup v. Delo</u>, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed. 2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." <u>Schlup</u>, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence—whether

---

[7] The federal court should honor the procedural bar even if the state court alternatively reviewed the claim on the merits. <u>Marek v. Singletary</u>, 62 F.3d 1295, 1302 (11th Cir. 1995); <u>Alderman v. Zant</u>, 22 F.3d 1541 (11th Cir. 1994).

it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.

*Id.*

Within this framework, the court will review Petitioner's claims.

IV.   PETITIONER'S CLAIMS

> Ground One:  "Defense counsel rendered ineffectiveness [sic] by introducing and eliciting damaging and opinion testimony referencing the Defendant as the driver of the vehicle which was prohibited by the stipulated order in limine, removed the ultimate question of guilt from the jury, relieved the state of its burden of proving same, and denied the Defendant his right to a fair trial."

Petitioner asserts the defense obtained a Stipulated Order In Limine requiring all State and defense witnesses to refrain from referring to Petitioner and the victim, Daniel Smith, as either the "driver," "operator," or "passenger" of the vehicle involved in the fatal collision, because whether Petitioner was driving or operating the vehicle was a material issue of fact to be determined by the jury (doc. 10 at 6, 8–9).  Petitioner asserts the defense theory pursued at trial was that he was not driving the vehicle at the time of the accident that resulted in Mr. Smith's death (*id.*).  Petitioner argues defense counsel "negated" this defense by eliciting and introducing testimony from Leslie Cornielle, Trooper Johnny Freeman, and Douglas Sprissler, that Petitioner was the driver of the vehicle involved in the crash that killed Daniel Smith (*id.*).  As to Ms. Cornielle, Petitioner additionally argues defense counsel erred by introducing her statement to Trooper Matthew Freeman to the effect that the victim's mother did not deserve to lose a son at Christmas, because this statement inflamed the emotions of the jury and was thus extremely prejudicial (*id.*).

Respondent does not definitively state whether Petitioner exhausted his state court remedies as to this claim.  Respondent concedes (1) Petitioner presented this claim to the state circuit court in his amended Rule 3.850 motion, (2) the circuit court summarily denied it, (3) Petitioner appealed the decision to the First DCA, (4) the First DCA affirmed the lower court's decision, and (5) the state courts adjudicated the claim on the merits (doc. 26 at 12–16).  Yet with regard to exhaustion, Respondent argues, "it appears that Petitioner exhausted this claim . . .; however, the State does not waive exhaustion" (*id.* at 16 n.3).  Respondent argues the state court's adjudication of Petitioner's

claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 17).

1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668 (1984).  To obtain relief under Strickland, Petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

"The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." Jones v. Campbell, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing Chandler v. United States, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  The focus of inquiry under the performance prong is "reasonableness under prevailing professional norms." Strickland, 466 U.S. at 688–89.  "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  If the record is not complete regarding counsel's actions, "then the courts should presume 'that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." Jones, 436 F.3d at 1293 (citing Chandler, 218 F.3d at 1314–15 n.15).  Furthermore, "[e]ven if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Counsel's performance is deficient only if it is "outside the wide range of professional competence." Jones, 436 F.3d at 1293 (citing Strickland, 466 U.S. at 690); Lancaster v. Newsome, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").  "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." Michael v. Crosby, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting Chandler, 218 F.3d at 1317).  Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict

the wide latitude counsel have in making tactical decisions.'" *Id.* (quoting <u>Putman v. Head</u>, 268 F.3d 1223, 1244 (11th Cir. 2001)).

As to the prejudice prong of the <u>Strickland</u> standard, Petitioner's burden of demonstrating prejudice is high. *See* <u>Wellington v. Moore</u>, 314 F.3d 1256, 1260 (11th Cir. 2002). The Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Id.* (quoting <u>Strickland</u>, 466 U.S. at 693). However, the Court has also clarified that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. <u>Strickland</u>, 466 U.S. at 693–94. Instead,

> The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. Indeed, it would be "contrary to" the law clearly established in <u>Strickland</u> for a state court to reject an ineffectiveness claim for failing to prove prejudice by a preponderance of the evidence. <u>Williams v. Taylor</u>, 529 U.S. at 405–06.

The prejudice assessment does "not depend on the idiosyncrasies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. <u>Strickland</u>, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. Further, when the claimed error of counsel occurred at the guilt stage of trial (instead of on appeal), <u>Strickland</u> prejudice is gauged against the outcome of the trial, not on appeal. *See* <u>Purvis v. Crosby</u>, 451 F.3d 734, 739 (11th Cir. 2006) (citing <u>Strickland</u>, 466 U.S. at 694–95).

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. <u>Strickland</u>, 466 U.S. at 698; <u>Collier v. Turpin</u>, 177 F.3d 1184, 1197 (11th Cir. 1999).

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim One in his amended Rule 3.850 motion (Ex. Y1 at 417–21). The court adjudicated the claim as follows:

### 1. Damaging Testimony

In this allegation, Defendant states that counsel was ineffective for eliciting damaging testimony from several witnesses, all of whom referred to Defendant as the driver of the vehicle in question even though the stipulated order in limine required that "all State witnesses and all Defense witnesses shall refrain from referring to the Defendant . . . as either a driver or an operator or a passenger."[FN 7] Despite the order in limine, Witness Douglas Sprissler stated that Defendant was "definitely the driver" and the deceased was "definitely the passenger." Also, during the recorded statement of Leslie Cornielle, which was played for the jury, Cornielle gave her opinion that Defendant seemed to be the driver of the vehicle, and the interviewer, Trooper Johnny Freeman, asked about Cornielle's speaking to "the driver."[FN 8] Defendant alleges that this testimony violated the stipulated order in limine and prejudiced him by "remov[ing] the ultimate question of guilt from the jury, reliev[ing] the State of its burden of proving same, and den[ying] the Defendant his right to a fair trial." Defendant alleges that these opinions were comments on Defendant's guilt and should not have been introduced before the jury. Defendant further alleges that the comment at the end of Cornielle's statement regarding a mother losing her son at Christmas was prejudicial to his defense.

[FN 7] <u>See</u> Defendant's Exhibit A at 137.

[FN 8] The Court notes that Defendant alleges that use of Cornielle's testimony should have been precluded by <u>Crawford v. Washington</u>, 541 U.S. 36 (U.S. 2004). However, nothing either in the Confrontation Clause or in <u>Crawford</u> guarantees Defendant the right to be confronted by witnesses in his favor. <u>See</u> <u>Harrell v. State</u>, 709 So. 2d 1364, 1368 (Fla. 1998) ("[T]he Confrontation Clause guarantees a criminal defendant the right to physically confront accusers"). <u>See also</u> <u>Smith v. Dorsey</u>, 198 F. Appx. 768,773 (10th Cir. 2006) (noting that no violation of the Confrontation Clause occurred when the attorneys entered a stipulation as to the statement of a defense witness who did not testify at trial). Cornielle was not a witness against Defendant, nor was she one of his accusers. Therefore, this allegation cannot entitle Defendant to relief.

<u>Driver</u>

Not a single witness testified to having seen Defendant actually driving the vehicle. In fact, each of these witnesses testified that he or she had come on the

scene after the accident had occurred. Sprissler testified that when he arrived on the scene the night of the accident, Defendant's vehicle was already sitting on its roof.[FN 9] Trooper J. Freeman testified, "Upon my arrival to the scene . . . [t]here was an SUV that was upside down on the westbound shoulder."[FN 10] Cornielle testified that she had not seen the actual collision, but that the "vehicles were still moving and it was in the air and it slid a little bit and stopped."[FN 11]

[FN 9] See Attachment 3, excerpt from trial transcript, at 190.

[FN 10] See Defendant's Exhibit A at 218.

[FN 11] See Defendant's Exhibit A at 422. The Court notes that in her first interview, Cornielle had testified that she had seen the accident occur but in her second interview she said that she had not. However, even her first interview indicates that her observations began after the events had been set in motion. See Defendant's Exhibit A at 416.

The testimony of each witness who opined that Defendant was the driver, therefore, was clearly based on the positions of the men's bodies in the aftermath of the accident. Sprissler stated that the "person that . . . was on the driver's side" was the driver, and the "person that . . . was on the passenger side" was the passenger.[FN 12] Cornielle stated that the man she talked to was "probably the driver because he was on this side where the steering wheel was." She affirmed twice more that the man to whom she had spoken had been near the steering wheel. She stated that based on where the men were "situated in the car" it seemed to her that the man with whom she had spoken "looked like he was the driver."[FN 13] Trooper Johnny Freeman's reference to the "driver" in his interview of Cornielle was similarly based on his observations, as evidenced by his testimony at trial that the person still inside the vehicle was located on the driver's side, near the steering wheel, with one of his feet caught under the gas and brake pedals of the vehicle.[FN 14] Therefore, it was obvious to the jury that the references to Defendant's being the "driver" were all based on the various witnesses' observations of the final resting places of the two occupants of the vehicle after the accident.

[FN 12] See Defendant's Exhibit A at 198.

[FN 13] See Defendant's Exhibit A at 415–36.

[FN 14] See Defendant's Exhibit A at 219–20.

The jury were equally able to make such deductions. Even without the opinion testimony of which Defendant complains, the jury would still have had much

evidence to consider in coming to a verdict, including the photographs of the accident scene, the undisputed testimony regarding where each man was found in the aftermath of the accident, and the expert testimony that there was no way to know who had been driving the vehicle at the time of the collision. Therefore, any assertion that the jury relied upon the witnesses' opinions in determining their verdict is pure speculation and cannot rise to the standard enunciated in <u>Strickland</u>. <u>See</u> <u>Bass v. State</u>, 932 So. 2d 1170, 1172 (Fla. 2d DCA 2006). Hence, the Court finds that Defendant cannot show that the outcome of the trial would have been different had these witnesses refrained from using the word "driver" with respect to Defendant. Therefore, Defendant has failed to show prejudice, and this allegation does not entitle him to relief.[FN 15]

> [FN 15] Defendant also notes that Trooper Matt Freeman stated that all drivers in these types of accidents are read their warnings pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966). However, Defendant has not shown that his counsel was ineffective in the handling of this testimony. Counsel sought a mistrial due to the trooper's misstatement, and, upon its denial, sought a curative instruction. Counsel also lodged a continuing objection to the form of the curative instruction for sake of appeal. <u>See</u> Attachment 3 at 333–52.

<u>Losing Son at Christmas</u>

Defendant has not shown that the one off-hand remark made at the end of the recording prejudiced him. The statement of which Defendant complains was not directed at him, nor was it accompanied by any statement indicating that Cornielle thought that Defendant should be punished for the death. Rather, it was a simple statement of fact that she wanted to see that "whatever happened was fixed" because it was such a tragedy.[FN 16] In fact, a review of Cornielle's testimony reveals that her statement focused mainly on the third vehicle.[FN 17] Also the comment was never mentioned in closing arguments or referenced in any fashion by the attorneys. Hence, it was a single statement buried in a trial that lasted two days with a transcript spanning more than four hundred pages. Defendant has not shown that absent this single comment, he would have been acquitted. This allegation cannot entitle him to relief.

> [FN 16] <u>See</u> Defendant's Exhibit A at 436.

> [FN 17] <u>See</u> Defendant's Exhibit A at 415–436.

(Ex. AA at 628–31). Petitioner appealed the decision to the First DCA (Ex. BB). He filed a merits brief and argued this issue in his brief (Ex. CC). The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

The state circuit court correctly cited the <u>Strickland</u> standard as the applicable legal standard (Ex. AA at 626–28). Petitioner has not shown that the court reached a conclusion different from the Supreme Court in a case involving materially indistinguishable facts. Therefore, he has not satisfied the "contrary to" prong of § 2254(d) and may obtain relief only if he demonstrates the state court's decision was unreasonable. As previously discussed, in determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court may not issue the writ simply because it concludes the state court's application was erroneous or incorrect; rather, the federal court must conclude that the application was unreasonable. *See* <u>Gill</u>, 633 F.3d at 1287. The federal habeas court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court. *See* <u>Harrington</u>, 131 S. Ct. at 786; *see also* <u>Gill</u>, *supra,* at 1292.

To assess whether defense counsel performed deficiently with respect to witnesses' use of the word "driver," and whether Petitioner was prejudiced by the references, the court will review the references in the context of all of the evidence adduced at trial. Donald Greer testified that on December 12, 2005, he was driving west on Gulf Beach Highway, and there was a line of traffic in the oncoming lane heading east, which was beginning to back-up (Ex. F at 168–69). He testified a Suburban in the neighboring, oncoming lane suddenly swerved into his lane as if to avoid another vehicle (*id.* at 170–71, 176–77). Greer testified he hit the passenger side of the Suburban (*id.*).

Charlie McCormick testified he was driving behind Mr. Greer (Ex. F at 182–84). He testified he saw a small white or light-colored car at the end of the line of backed-up traffic in the neighboring, oncoming lane (*id.* at 184–85). He testified he saw a Suburban traveling in the neighboring, oncoming lane at a relatively high rate of speed, and when the Suburban approached the end of the line of backed-up traffic, the Suburban turned left in front of Mr. Greer's vehicle, and Mr. Greer's vehicle hit the passenger's side of the Suburban (*id.*). He testified the Suburban "kind of turned and flipped on its top" (*id.* at 185).

Daniel Sprissler, a volunteer firefighter, responded to the collision (Ex. F at 189). He testified he observed two vehicles, one of which was upside down (*id.* at 191). Mr. Sprissler testified he saw two people inside the upside down vehicle, one on the driver's side and one on the passenger's side (*id.* at 192). He testified at some point while he was at the scene, the person on the passenger's side was declared dead (*id.*). During cross-examination, defense counsel asked:

> Q. So in the—you have seen accidents where vehicles were overturned and the occupants of the vehicles that were overturned were unrestrained or not wearing seat belts?
>
> A. Yes, sir.
>
> Q. Have you seen those kind of vehicles where the occupants were, in fact, ejected due to the vehicle rolling over?
>
> A. Yes, sir.
>
> Q. So are you telling this jury today that, as a matter of fact, that the person that you say was on the passenger side, are you saying to this jury that that person was definitely the passenger? Is that what you're saying?
>
> A. Yes, sir.
>
> Q. And you're saying that the person that you say was on the driver's side, that was definitely the driver?
>
> A. Yes, sir.
>
> . . . .
>
> Q. . . . the person that was on the—on the passenger side of the car, had that person been partially ejected or not?
>
> A. From what I remember, he was ejected—fully ejected from the vehicle.
>
> Q. Fully ejected?
>
> A. And the vehicle was on top of him.
>
> Q. And the person that was on the driver's side, was that person partially ejected or fully ejected?
>
> A. Partially, from what I remember.

(Ex. F at 197–99).

Randall Johnson testified he also responded to the collision as a volunteer firefighter (Ex. F at 207). He testified when he initially saw the Suburban, there was one individual in the vehicle (*id.*). He testified the individual was on the driver's side of the vehicle, partially ejected, and partially pinned by the steering wheel, on his back looking upwards toward the hood (*id.*). He testified this individual was alive (*id.*). Mr. Johnson testified he observed another individual underneath the passenger side of the Suburban, and that individual was dead (*id.* at 208).

Johnny Freeman, a traffic homicide investigator with the Florida Highway Patrol, testified he observed one person inside the Suburban and another person outside the Suburban underneath it (Ex. F at 219). He testified the person inside the Suburban was on the driver's side "right up under the steering wheel," with his back on the windshield and one foot under the pedals and the other leg straight out (*id.* at 219–21). Mr. Freeman identified Petitioner as the person inside the Suburban (*id.* at 220). Freeman testified Daniel Smith was outside the Suburban, underneath the passenger side (*id.*). Mr. Freeman identified photographs of the bodies of Petitioner and Mr. Smith as they appeared when he saw them at the crash scene, and the photographs were admitted into evidence (*id.* at 221–24).

Defense counsel elicited testimony from Johnny Freeman regarding a diagram he prepared in his crash report, photographs of the vehicles involved in the crash, and photographs of the crash scene, including the streets and buildings near the scene (Ex. at F 228–35). Defense counsel also questioned Freeman regarding a sworn, audio-recorded statement he took from Leslie Cornielle (*id.* at 228–41). Freeman testified he incorporated Ms. Cornielle's observations into his diagram and included them in his crash report (*id.*). Defense counsel elicited testimony from Freeman that Ms. Cornielle stated a vehicle had pulled out in front of the Suburban, and the Suburban had to veer off to avoid colliding with the vehicle (*id.* at 238). Defense counsel elicited testimony that the front seat of the Suburban had a "bench" seat, as opposed to "bucket" seats, and the gear shift was on the steering column, not the floor, which would allow persons in the front seat to move freely in the front seat (*id.* at 230–31, 243). Counsel also elicited testimony that neither occupant of the Suburban was restrained with a seat belt (*id.* at 241). Counsel elicited testimony that when a vehicle is flipped upside down and the occupants are unrestrained, it is not unusual for the occupants to be ejected

from the vehicle (*id.* at 241–42). Counsel elicited testimony from Trooper Freeman that an open bottle of beer was found in the front seat of Mr. Greer's vehicle (*id.* at 251–53). Freeman also testified that investigators did not attempt to lift any fingerprints from the steering wheel of the Suburban to determine who was driving (*id.* at 250).

Matt Freeman, a corporal with the Florida Highway Patrol, testified that the registered owner of the Suburban was Julie Coleson, Petitioner's wife (Ex. F at 271). He testified the speed limit where the collision occurred was thirty-five (35) miles per hour (*id.* at 358). Freeman also testified extensively regarding his determination as to the location of the vehicles just prior to impact and where the point of impact occurred (*id.* at 265–71, 283–88). He testified he prepared an accident diagram that was different from the diagram prepared by Johnny Freeman (which was based upon Leslie Cornielle's statement) (*id.* at 271, 282). He testified the difference in the diagrams was that his diagram did not show a third vehicle that Ms. Cornielle had described as pulling out in front of the Suburban (*id.* at 282). He testified he was not able to verify the existence of a third vehicle, so he did not include it in his report (*id.*).

On cross-examination, Matt Freeman admitted he was not an accident reconstruction expert (Ex. F at 291). Freeman testified he observed the open bottle of beer in Mr. Greer's car (*id.* at 293). Counsel elicited testimony that when a vehicle is overturned and the occupants are not wearing seat belts, the occupants may sometimes be thrown out of the car and land a long distance away (*id.* at 306–07). Freeman testified he interviewed Leslie Cornielle three weeks after Johnny Freeman had interviewed her (*id.* at 299, 324). Mr. Freeman testified Ms. Cornielle told him she heard two separate squealing tire noises (*id.* at 325). Freeman testified "we assume" the first squealing sound was the unidentified, third vehicle (*id.*).

Additionally, defense counsel elicited testimony from Matt Freeman that Petitioner's blood alcohol level was .22, and Mr. Smith's was .07, which was below the legal limit when the crash occurred (Ex. F at 309). Counsel asked:

> Q. And so one very probable scenario is that Mr. Coleson and Mr. Smith could have agreed that Mr. Smith was the designated driver, right?
>
> A. That's a possibility.
> . . . .

Q. If Mr. Smith was the designated driver and he was driving, and he either caused or helped cause the accident, then he's responsible for his own death, isn't he?

A. If he was driving.

(Ex. F at 310).

Defense counsel also elicited testimony from Matt Freeman regarding his contact with Petitioner during the investigation. Freeman testified he first contacted Petitioner fifteen (15) days after the crash, while Petitioner was still in the hospital (Ex. F at 330). Freeman testified Petitioner told him he did not remember what happened (*id.* at 331). Defense counsel concluded cross-examination with the following questions:

Q. And when you talked to him the first time in the hospital, didn't you advise him of his rights under the Miranda decision?

A. Yes, sir, I did.

Q. So he knew he was being questioned regarding a possible criminal case that involved him?

A. All drivers in these type of crashes are read Miranda.

Q. And then you finally got a warrant and Mr. Coleson turned himself in voluntarily on March 25, 2006, didn't he?

A. Yes, sir, he did.

(Ex. F at 332). The court asked counsel to approach the bench regarding a scheduling matter, at which time defense counsel moved to strike Trooper Freeman's statement, "All drivers in these type of crashes are read Miranda," and requested a curative instruction:

MR. OWENS [one of Petitioner's attorneys]: I would like a curative instruction to the jury right now that the comment that was just made by the trooper that all drivers are read Miranda or questioned in an investigation, that that assumes that our client was the driver. And I think we had a motion in limine that none of the witnesses were going to give the opinion that the Defendant in this case was the driver. I'd ask some instruction saying that he cannot give that opinion. He's not qualified to give that opinion. He does not know, and that was an improper comment made by the trooper. And it was spontaneous; it was not in response to a question.

(Ex. F at 333–34). After a lunch recess defense counsel modified his request:

Case No.: 3:12cv96/MCR/EMT

MR. OWENS: First I would make a motion or move for a mistrial. I don't think it can be cured by such an instruction. It was important that this issue be decided by the trier of fact as to who was operating the vehicle based on the circumstantial evidence because there was no direct evidence, no eye witnesses that saw our client operating the motor vehicle. And jurors tend to give great weight to police officers, especially those that have qualified as a traffic homicide investigator, and especially those that have indicated it took several weeks of investigation before coming to a conclusion about an event. And when the witness made the statement that we only give—we always give <u>Miranda</u> rights to drivers of vehicles involving crashes, or some words to that effect, that was an opinion that was matter of fact. That was expressed in the form of not only opinion but certainty—a level of certainty. The jury—especially with the other fact that we had, I believe, a written order that was based on a motion in limine that the parties held before this Court, and the Court made a finding that that was not to be allowed—any witness was allowed to express an opinion about who was the driver of the vehicle in question. It was unsolicited. . . . . It was unsolicited and in violation of that order, and if the court doesn't grant the mistrial, then we're forced with going back over cross-examination on that issue and it's going to draw attention to it. I know the Court has expressed an interest in not even dealing with it and not drawing other attention to it, but the fact is you can't unring that bell. And you're hoping that the jury may not have given much weight to it or disregarded it, so given a curative instruction may add more attention to it. But anything we do—cross-examination on the issue is going to draw more attention to it, and I think the only remedy that would protect our client is a mistrial.

THE COURT: The issue about which there was a stipulation was that Counsel and the witnesses were not to refer to the Defendant or the decedent as—maybe I should say the decedent or the Defendant as a victim or a driver, and the stipulation had to do with characterizations. Frankly I believe it was primarily with regard to counsel but also witnesses characterizing the decedent as a victim or characterizing the Defendant as a driver. There's been testimony and there's going to be more testimony by which witnesses are going to opine who was the driver of the vehicle. And so obviously it was not your intent that no witness could use the word "driver" and no witness could ever say anything about who was the driver. In fact, I'm assuming that your expert witness is going to give an opinion about who was the driver of the vehicle. So the concept of there being some reference to the driver of the vehicle frankly is not terribly offensive. How I construed the stipulation was that there not be repeated characterizations of the decedent as a victim and of the Defendant as a driver.

So as far as a motion for mistrial, that one statement I'm going to find should not cause the Court to grant a mistrial particularly in light of the fact that I believe it was invited by Mr. Ammon's [one of Petitioner's attorneys] questioning of the witness asking the witness to speculate on whether or not Mr. Coleson knew that he

was the subject of a criminal investigation. With that said, I'm going to deny the motion for mistrial. If you ask me to strike the testimony, I will strike that testimony and I will give a curative instruction. Are you requesting that I strike the testimony?

      MR. OWENS: Yes, and a curative instruction.

. . . .

      THE COURT: Okay, Counsel, . . . I've got what's typed up [by] Mr. Owens. I'm going to provide it to the clerk so it will be in the record, but it reads as follows: "You are instructed that the witness' unsolicited opinion as to whether the Defendant may or may not have been the driver of the vehicle involved in the crash was improper. The witness, Trooper Matthew Freeman, is not qualified to give that opinion. You are instructed to disregard that testimony. The issue as [sic] whether the driver involved in the crash is the ultimate issue of fact to be decided by you, the jury."

      I'm going to reject that specific request, but I will give the curative instruction, if requested, which will be as follows . . . .

(Ex. F at 342–51). The Court instructed the jury:

      THE COURT: . . . Ladies and gentlemen of the jury, before the recess in response to a question by Mr. Ammon the witness offered testimony regarding persons to whom <u>Miranda</u> rights are read. The statement was not responsive to the question and is hereby stricken. You are hereby instructed to disregard the statement. In deciding your verdict, you should not discuss the statement and you should not consider it. The issue of whether or not the Defendant was the driver is an issue of fact for your determination as a jury.

(Ex. F at 352–53).

The next witness was Andrea Minyard, the Chief Medical Examiner. She described Daniel Smith's injuries as follows: abrasions on the right side of his face and neck, a raised bruise on the right side of his scalp, a laceration on the right side of his scalp, bruises under the surfaces of the right side of his scalp, bruises in his right eye, a bruise on the left side of his tongue, bleeding on his brain, a large abrasion on his right upper back, blood in both chest cavities, a fracture to the back of his right third rib, a cut on his right lung, bruises on his left lung, a transected or cut aorta, blood in his abdomen, lacerations of the right side of his diaphragm, lacerations of his liver, a fractured pelvis, bruised testicles, abrasions on his right arm and forearm, abrasions on his right thigh, bruises on his right leg, and abrasions and a bruise on his left thigh (Ex. F at 368–70). She testified the

cause of Mr. Smith's death was multiple blunt force injuries, and the manner of death was accident (*id.* at 370).

On cross-examination, defense counsel asked Dr. Minyard whether Mr. Smith could have suffered the abrasions to the right side of his face from hitting the ground or the vehicle landing on him, and she responded "Yes." (Ex. F at 380–81). Counsel asked whether she found any glass on Mr. Smith's face where the abrasions occurred, and she responded, "No." (*id.*). Counsel asked whether it was common that when a person is a passenger in an accident in which the vehicle is "T-boned," the side window glass is shattered, and the face hits that glass, that fragments of glass would be found in the skin, and the medical examiner responded, "Yes." (*id.*). Counsel confirmed that she did not find any glass in the right side of Mr. Smith's face (*id.*).

On re-direct, the prosecutor asked Dr. Minyard whether she was asked to give an opinion as to who the driver was, and she responded, "Not that I can recall . . ." (Ex. F at 383). The prosecutor asked whether the fact that there was no glass in the right side of Mr. Smith's face meant he could not have been the passenger, and she responded, "No," that Mr. Smith still could have been the passenger (*id.* at 384).

The first witness for the defense was Donna Garrett. She testified she was working as a bartender at the Colonial Inn at the intersection of Gulf Beach Highway and Mills Road at the time of the collision (Ex. F at 404–05). She testified she looked outside the window of the bar and saw a black car "cutting through" the parking lot to avoid a stop sign and "float out into" Gulf Beach Highway (*id.* at 405, 410–11). She testified when the black car pulled out, she heard screeching tires and a crash (*id.* at 405–07). She testified she heard two separate screeching tire sounds (*id.* at 407–08). She testified that when she heard the crash, she opened the door of the bar and saw an SUV upside down (*id.* at 407). She testified she did not recall that Leslie Cornielle was at the bar that night (*id.* at 408–10).

The defense then introduced two sworn statements of Leslie Cornielle (Ex. F at 413–36). Ms. Cornielle gave the first statement to Trooper Johnny Freeman on December 12, 2005, and the second statement to Trooper Matt Freeman on January 2, 2006 (*id.*). She stated she was in the bar of the Colonial Inn on December 12, 2005, and saw a gray SUV and a white vehicle crash, and it appeared the gray SUV was avoiding hitting a small, "sports-type" vehicle that had pulled out in

front of it (*id.* at 416–18).  She stated the gray SUV slammed on the brakes and swerved to the left, and the white vehicle acted as a ramp, causing the SUV to flip upside down (*id.* at 417).  She stated by the time the SUV flipped, the "sports-type" vehicle had "peeled out" (*id.*).  She stated she ran to the SUV and spoke to the man under the dashboard, and he stated, "Help me" and gasped for air (*id.* at 418).  Johnny Freeman asked, "When you went over to talk to the driver and he said help me, . . . did you detect any odor of alcohol or something unusual coming out of there?"  Ms. Cornielle responded, "No" (*id.* at 418).  Speaking of the man she spoke to, Ms. Cornielle stated, "I didn't know where he—who he was, if he was driving or not.  He was just hanging there from the windshield." (*id.* at 419).

In her statement to Matt Freeman, Ms. Cornielle stated she saw a small white car pass on Gulf Beach Highway and, two seconds later, she saw the Suburban pass (Ex. F at 424–25).  She stated she was "pretty positive" the white car had cut through the parking lot to avoid a stop sign and pulled onto Gulf Beach Highway (*id.*).  She stated she heard a faint sound of tires squealing, which she assumed was the white car, and then heard a loud sound of tires squealing (*id.* at 426–27, 434–35).  She testified she heard impact immediately after the second tire-squealing, and she ran out the door and saw the Suburban moving and landing upside down (*id.* at 425, 427–28).  She stated she ran to the SUV to see if she could help, but by then there was nothing she could do to get the occupants out (*id.* at 430).  She stated, "I bent down and I said, can you hear me?  He said, yeah, get me out of here." (*id.* at 431).  Trooper Freeman asked, "Which one was this one?" (*id.*).  Ms. Cornielle responded:

> Um, let's see. The vehicle was upside down so probably the driver because he was on this side where the steering wheel was and he said, get me out of here. And I said, help's on the way, you now, just hang tight.  Don't try to move around too much, you know.  I didn't—I don't know much about [unintelligible], stuff like that, so—
>
> Q.  Did you see any of the occupants of the Suburban?  Could you tell how many occupants were in the Suburban?
>
> A.  Two that I know of.  I only seen [sic] two people.
>
> Q.  Did you see anyone ejected out of the vehicle?

A. No.

Q. So both occupants that you saw were still inside the vehicle?

A. Inside the vehicle, yes, sir.

Q. Could you tell me where either of the occupants were? I know you said you thought the one was the driver.

A. Yeah, yeah.

Q. What, near the steering wheel?

Q. Yeah. He had like brownish-colored hair and the other guy was bald, and you could tell he—he had already stopped breathing by the time I seen [sic] him and then the—the guy that had the steering wheel in front of him was on the side of the vehicle [unintelligible] down, and he, um, he was talking and then he quit talking, so I thought that he had passed as well.
. . . .

Q. So just the placement where you saw them, uh, the one that actually spoke to you who said get me out of here, where was he at [sic] again?

A. He was, um, on the side of the vehicle. The vehicle was upside down, of course, and the steering was right—I mean, like right by his head. It had broken loose or I don't know if it was dangling or exactly what because I was focusing on the gentleman in the vehicle. But he seemed to be the driver, right by the steering wheel.

Q. Just from all accounts that you remember, he [sic] walked up and you just looked at where they were situated in the car. You—it pretty much looked like he was the driver, the one you talked to?

A. Uh-huh, yeah. I knelt down and spoke to him.
. . . .

Q. Okay, okay, great. All right, Ms. Cornielle, is there anything else that maybe I haven't covered with you that you think might be important to add to this investigation?
. . . .

A. I can't think of anything.
. . . .

A. But I will definitely call you if I hear anybody that seen [sic] anything or—
. . . .

A.  Because I'd really like to know that, that whatever happened is fixed because that woman sure didn't deserve to lose a son at Christmas.  It's horrible.

(Ex. F at 431–36).

The defense presented testimony of Christopher Medwell, an accident reconstruction expert (Ex. F at 437).  He testified the Suburban was traveling at 45–47 miles per hour when Mr. Greer's vehicle impacted it, and Mr. Greer's vehicle was traveling at 39–40 miles per hour (*id.* at 452).  Mr. Medwell testified the Suburban traveled at 17 miles per hour after Mr. Greer's vehicle hit it, and Mr. Greer's vehicle hardly moved after the impact (*id.* at 451).  Mr. Medwell testified the impact on the right side of the Suburban would force both of the unrestrained occupants toward the passenger side of the vehicle until their bodies hit something solid (*id.* at 453–54).  He testified the windows would have shattered almost immediately upon the collision, and any part of an occupant's body that was headed toward the window openings would go right through the window openings (*id.*).  Mr. Medwell testified that if a person's foot was found under a pedal after the vehicle rested, that person reached that position during the rollover, after the impact (*id.* at 455).  He testified that if the pedal caught the person's foot while the person was moving toward the passenger side, the force would have caused noticeable injury to the foot (*id.*).  He testified either the driver or the passenger could have ended up partially outside the compartment after the impact, because they both would have been thrust right toward the door, and the glass in the window would have already shattered (*id.* at 455–56).  He testified there was no obstruction to motion from the driver's side to the right/passenger side (*id.* at 456).  Mr. Medwell testified that as the vehicle slid and rotated away from impact, it rolled onto the driver's side and then onto its roof (*id.*).  He testified during the roll, the person still inside the vehicle would fall down to the driver's side, whether that person was the driver or the passenger (*id.* at 456–57).  He testified that the person who ended up partially out of the window, would be flipped onto the roof as the vehicle rolled, and then would be under the vehicle when the vehicle landed on its roof (*id.* at 457).  Mr. Medwell testified he concluded there was no way to determine from the physical evidence who was driving the Suburban, because either of the occupants could have ended up outside the vehicle (*id.*).

Petitioner testified he was not driving his wife's Suburban at the time of the collision (Ex. F at 470).  He testified Daniel Smith was driving (*id.*).  Petitioner testified his injuries from the

collision included fractured vertebrae in his spine and neck, numerous broken ribs, a collapsed right lung, closed head trauma to the right side of his head, injury to his right hip and shoulder, a broken bone in his right elbow, a cut above his right eye, and partial paralysis on the left side of his body and in his legs (*id.* at 471–72). He testified he was in the hospital for one month and was in a medically induced coma part of that time (*id.*). Petitioner testified he initially had problems with his memory regarding the collision, due to his head injury and the medication he was taking (*id.* at 472). He testified Matt Freeman visited him at the hospital, but at that time, Petitioner was on medication and "didn't know what was going on" (*id.* at 473). He testified he convalesced at his sister's home in Georgia and provided Freeman his name and telephone number where he could be reached (*id.*). Petitioner testified Freeman contacted him four or five times in Georgia (*id.*). He testified he began to regain some of his memory regarding the collision and recalled the following:

> I remember getting in the vehicle at Daniel Smith's girlfriend's house and backing out of the driveway, and I backed into a mailbox. I asked him to get out and straighten up the mailbox, and he did. He got back in the passenger seat, and I pulled up to the stop sign. He asked me, he said, Jim, do you want me to drive? I looked at him and I said, if you think you can. He got out of the vehicle on the passenger side, walked around the back over to the driver's side. I put the truck in park, opened up the door and slid over. He got it. I looked to my right and told him, you got it this way, and he pulled out.

(Ex. F at 474). Petitioner testified as Daniel Smith was driving toward Navy Boulevard, a car "came into the side of the vehicle" (*id.* at 475). Petitioner testified he yelled to Smith to lookout, and Smith snatched the wheel to the left and went into the line of oncoming traffic (*id.*). Petitioner testified he was on the passenger side of the vehicle when it was struck (*id.*). Petitioner testified his memory began coming back during "nightmares, at night waking up, crying. I couldn't get it out of my head—seeing it." (*id.* at 475). He testified he mentioned his recollection to Trooper Matthew Freeman on the telephone while he was in Georgia (*id.* at 475–76). Petitioner testified Freeman called him and told him a warrant had been issued for his arrest, and Petitioner's sister drove him to Florida and he turned himself in, at which time he again told Freeman his recollection (*id.* at 476–77).

On cross-examination, Petitioner stated he did not know the name of Daniel Smith's girlfriend, what she looked like, where she lived, what her house looked like, the street she lived on, or what the mailbox looked like (Ex. F at 478).

The defense rested, and the State re-called Matt Freeman. Freeman testified he spoke to Petitioner's sister while Petitioner was in Georgia, but he never spoke to Petitioner (Ex. F at 480). Freeman also testified that when Petitioner turned himself in, Petitioner did not tell him he remembered anything about Daniel Smith driving, nor did he (Petitioner) tell him he was not driving (*id.*). Freeman testified Petitioner never mentioned hitting the mailbox or changing drivers at Smith's girlfriend's house (*id.* at 480–81). On cross-examination, Freeman admitted he did not make any notes about his conversations with Petitioner's sister (*id.* at 482–83).

The trial proceedings reconvened the next morning. The prosecutor advised the court and defense counsel that Matt Freeman had reviewed his notes the night before, and realized that his notes indicated that on the day Petitioner turned himself in, Petitioner told Freeman that he recalled hitting the mailbox, as well as Daniel Smith's offering to drive (Ex. F at 530). However, Freeman stated Petitioner never told him that he and Mr. Smith switched places, such that Smith was driving at the time of the collision (*id.*). The prosecutor offered to present Mr. Freeman's corrected testimony, if defense counsel wished him to do so (*id.*). Defense counsel declined to re-open the evidence (*id.* at 531).

The undersigned concludes no reasonable jurist could debate the conclusion that defense counsel's performance was deficient. The primary defense strategy was to highlight the circumstantial nature of the State's evidence regarding who was driving the Suburban, prohibit witnesses from referring to the occupants as "driver" or "passenger," present expert testimony that the issue of who was the driver could not be determined by the circumstantial physical evidence, and present direct evidence (Petitioner's testimony) that Mr. Smith was the driver.[8] In pursuit of this strategy, defense counsel obtained an order providing that all witnesses shall refrain from referring to Petitioner or Daniel Smith as either the driver/operator or the passenger (Ex. D). The prosecutor elicited no such references from witnesses. The defense, on the other hand, elicited Douglas

_____

[8] The secondary strategy was to introduce evidence that a third, unidentified vehicle caused the collision.

Case No.: 3:12cv96/MCR/EMT

Sprissler's opinion (the volunteer firefighter) that the person he observed on the driver's side of the vehicle was definitely the driver, and the person on the passenger side was definitely the passenger. Defense counsel also introduced and published to the jury Johnny Freeman's and Matt Freeman's interviews with Leslie Cornielle, in which all three of them referred to the occupant pinned under the steering wheel as the driver, without redacting those references. Defense counsel's performance in this regard constituted error that no competent counsel would make.[9]

However, disagreement could exist as to whether Petitioner was prejudiced by counsel's error. Fairminded jurists could conclude that there is a reasonable probability Petitioner would have been acquitted if defense counsel had not elicited and introduced testimony that Petitioner was the driver. As previously discussed, there was no direct evidence that Petitioner was the driver. The only evidence that Petitioner was the driver was the testimony from several witnesses that after the crash, Petitioner was partially pinned under the steering wheel with one foot under the pedals, and the photographs of the positions of Petitioner's body and Mr. Smith's body immediately after the collision. The defense's reconstruction expert testified there was no way to determine from this physical evidence who was driving the Suburban. Petitioner testified he was not driving the Suburban at the time of the collision. Fairminded jurists could conclude there is a reasonable probability Petitioner would not have been convicted had defense counsel not introduced the volunteer firefighter's testimony that Petitioner was definitely the driver, and allowed the jury to hear Ms. Cornielle and the state troopers (Johnny and Matthew Freeman) refer to Petitioner as the driver.

---

[9] Defense counsel was not deficient for introducing Leslie Cornielle's statement at the end of her interview with Matt Freeman that she would like to see that "whatever happened was fixed" because Daniel Smith's mother did not deserve to lose her son at Christmas. The focus of much of Ms. Cornielle's discussion with Freeman was on the unidentified third vehicle that pulled out in front of the Suburban; therefore, her reference to "fixing" the situation could have been reasonably construed as referring to finding the driver of the unidentified third vehicle. Her statement supported the defense's argument during closing that Petitioner was left "holding the bag" for Daniel Smith's tragic death, because Mr. Smith lost his life, and law enforcement could not locate the third vehicle that caused the driver of the Suburban to swerve in front of Mr. Greer (Ex. F at 559).

Additionally, Petitioner's argument in his reply that defense counsel was ineffective for failing to object to the prosecutor's violations of the Stipulated Order in Limine (*see* doc. 29 at 29–31) is wholly without merit. The undersigned reviewed the trial transcript and found no violations of the order by the prosecutor.

However, fairminded jurists could also conclude there is no reasonable probability Petitioner would have been acquitted even if defense counsel had not made the mistake of eliciting and introducing testimony that Petitioner was the driver.  The jury was clearly instructed that the State was required to prove beyond a reasonable doubt that Petitioner was driving the car at the time of the collision.  They jury was also aware, through the parties' opening statements, presentation of evidence, and closing arguments, that the issue of who was driving the Suburban was the focus of the trial.  The jury knew that no one actually saw Petitioner driving the car at the time of the collision, and any witness's reference to Petitioner as the driver was based purely upon that person's observation of the position of Petitioner's body after the collision.  The jury also knew that the accident reconstruction expert opined that there was no way to determine who was driving the vehicle at the time of the collision based upon the positions of the bodies after the impact.  But the jury saw photographs of Petitioner's and Mr. Smith's bodies in the wreckage and heard the witnesses describe Petitioner's body as partially pinned under the steering wheel with one foot under the pedals.  Additionally, Petitioner's delayed recollection of the events surrounding the collision, and his admission that this recollection returned in nightmares, reduced the credibility of his testimony that he was not driving.  The evidence convinced the jury beyond a reasonable doubt that Petitioner was the driver.

At a minimum, fairminded jurists could disagree as to whether the state court correctly concluded Petitioner was not prejudiced by defense counsel's eliciting and introducing testimony referring to Petitioner as the driver and opining that he was the driver.  This potential for disagreement precludes Petitioner from obtaining relief under § 2254(d).  *See* Harrington, 131 S. Ct. 786 ("A state court's determination that a claim lacks merit precludes habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision."); Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1127 (11th Cir. 2012) (if, at a minimum, fairminded jurists could disagree about the correctness of the state court's decision, the state court's application of Strickland was not unreasonable and AEDPA precludes the grant of habeas relief) (citing Harrington, *supra*).

B.    Ground Two:  "The Defendant was denied due process of law and the right to a fair trial when State representatives failed to correct false testimony."

Petitioner contends the prosecutor and the trial court denied him a fair trial guaranteed by the Sixth and Fourteenth Amendments by failing to correct Matt Freeman's incorrect testimony, that Petitioner never told him that prior to the collision, he hit a mailbox and Mr. Smith offered to drive the Suburban (doc. 10 at 6, 9–11).

Respondent contends Petitioner failed to properly exhaust this claim (doc. 26 at 18–20). Respondent contends Petitioner did not raise this issue on direct appeal (*id.*). Further, although Petitioner raised it in his amended Rule 3.850 motion, the state court rejected it on the well established procedural rule that claims of prosecutorial misconduct and trial court error are properly raised on direct appeal (*id.*). Respondent contends notwithstanding the failure to exhaust, the claim is without merit, because the State fulfilled its obligation to correct Trooper Freeman's testimony, and the defense declined the opportunity to correct Freeman's testimony (*id.* at 20–23).

In Petitioner's reply, he contends he has demonstrated a Fourteenth Amendment violation; therefore, he is entitled to federal review of his claim even if he failed to present it on direct appeal (doc. 29 at 31–32).

Petitioner raised his due process claim as Claim Two in his amended Rule 3.850 motion (Ex. Y1 at 422–25). The state court adjudicated the claim as follows:

### 2. Prosecutorial Misconduct and Trial Court Error

> Claims of prosecutorial misconduct and trial court error are properly raised on direct appeal rather than in a motion for postconviction relief. Therefore, this allegation is not cognizable here. See Pooler v. State, 980 So. 2d 460, 470 (Fla. 2008) and Henry v. State, 933 So. 2d 28, 29 (Fla. 2d DCA 2006).

(Ex. AA at 631). Petitioner argued this issue on appeal of the circuit court's decision (Ex. CC). The First DCA affirmed per curiam without written opinion (Ex. EE).

Rule 3.850 provides, "This rule does not authorize relief based on grounds that could have or should have been raised at trial and, if properly preserved, on direct appeal of the judgment and sentence." Fla. R. Crim. P. 3.850(c). A defendant may raise a claim of prosecutorial misconduct, and the trial court's failure to correct any alleged misconduct, on direct appeal of the judgment and sentence. *See* Pooler v. State, 980 So. 2d 460 (Fla. 2008) (claims of prosecutorial misconduct during closing argument and trial court error with regard to jury instructions are properly raised on direct

appeal, not in a motion for postconviction relief, and are thus properly rejected as procedurally if raised in a Rule 3.850 motion) (citations omitted). In the instant case, the state court record demonstrates Petitioner did not raise on direct appeal the issue of the prosecutor and trial court's failure to correct Trooper Freeman's incorrect testimony (*see* Ex. K). The state postconviction court's rejection of Petitioner's attempt to adjudicate the claim in the Rule 3.850 proceeding was based upon an independent and adequate state ground of procedural bar.

As previously discussed, to overcome a procedural default such that the federal habeas court may consider the merits of a claim, Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice. In his reply, Petitioner does not allege cause for his procedural default. However, the undersigned notes that in Petitioner's state habeas petition, he raised a claim of ineffective assistance of appellate counsel based upon counsel's failure to argue on direct appeal that the trial court violated his federal due process rights when the prosecutor and the trial court failed to correct Trooper Freeman's false testimony (Ex. X at 12–15). The First DCA denied the petition on the merits (*id.*).

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is the standard set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). *See* <u>Smith v. Robbins</u>, 528 U.S. 259, 285,120 S. Ct. 746, 764, 145 L. Ed. 2d 746 (2000) (citation omitted). The two components of an ineffectiveness claim under <u>Strickland</u> are performance and prejudice, and if an insufficient showing is made as to one, the court need not address the other. <u>Strickland</u>, 466 U.S. at 697. The focus of inquiry under the performance prong of the <u>Strickland</u> standard is whether counsel's assistance was "reasonable considering all the circumstances." *Id.* at 691. Appellate counsel who file a merits brief need not (and should not) raise every nonfrivolous claim but, rather, may select from among them in order to maximize the likelihood of success of on appeal. <u>Jones v. Barnes</u>, 463 U.S. 745, 753–54, 103 S. Ct. 3308, 3314, 77 L. Ed. 2d 987 (1983) ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."). To demonstrate prejudice, Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal. *See* <u>Robbins</u>, 528 U.S. at 285.

The Eleventh Circuit has issued several decisions interpreting the <u>Strickland</u> standard with regard to claims of ineffective assistance of appellate counsel. Appellate counsel cannot be deemed ineffective for failing to raise issues "reasonably considered to be without merit." <u>United States v. Nyhuis</u>, 211 F.3d 1340, 1344 (11th Cir. 2000) (quoting <u>Alvord v. Wainwright</u>, 725 F.2d 1282, 1291 (11th Cir. 1984)). Additionally, where an issue is not preserved for appellate review, appellate counsel's failure to raise the issue is not constitutionally deficient as it is based on the reasonable conclusion that the appellate court will not hear the issue on its merits. <u>Diaz v. Sec'y Dep't of Corrs.</u>, 402 F.3d 1136, 1142 (11th Cir. 2005); <u>Atkins v. Singletary</u>, 965 F.2d 952, 957 (11th Cir. 1992); <u>Francois v. Wainwright</u>, 741 F.2d 1275, 1285–86 (11th Cir. 1984). Moreover, the arguments omitted from the appeal must have been significant enough to have affected the outcome of the appeal. <u>Nyhuis</u>, 211 F.3d at 1344 (citing <u>Miller v. Dugger</u>, 858 F.2d 1536, 1538 (11th Cir. 1988)).

In this case, Petitioner's counsel filed a merits brief raising one issue, namely, that the trial court erred by denying defense counsel's motion for judgment of acquittal (Ex. K). Petitioner failed to show that appellate counsel was deficient for failing to argue error with respect to the prosecutor's and trial court's failure to correct Freeman's incorrect testimony, because Petitioner's trial counsel did not preserve the issue in the trial court, and in fact declined the opportunity to request that the evidence be re-opened to correct Freeman's testimony (*see* Ex. F at 530–31). Therefore, Petitioner failed to establish appellate counsel performed ineffectively for failing to raise the issue on direct appeal.

Petitioner failed to show cause for his procedural default of Ground Two. Further, he has not shown that this court's failure to review the claim would result in a fundamental miscarriage of justice, because he has not shown it is more likely than not that no reasonable juror would have convicted him in light of Freeman's corrected testimony that when Petitioner turned himself in, he told Freeman that prior to the collision he hit a mailbox and Smith offered to drive the Suburban. Therefore, Ground Two is procedurally barred from federal review.

C.    <u>Ground Three: "Defense counsel rendered ineffectiveness [sic] by failing to re-open the case and by advising the Defendant to agree to such after learning chief witness presented false testimony. Counsel was also ineffective for failing to object, move for</u>

<u>mistrial, and preserve for appeal trial court's denial of State's motion to re-open the case to correct same."</u>[10]

Petitioner asserts during trial, he advised defense counsel that Matt Freeman was not telling the truth during his testimony (doc. 10 at 7, 11–12). Petitioner states the next day, Freeman approached the court outside the presence of the jury and stated he had made a mistake in certain aspects of his testimony (*id.* at 11). Petitioner asserts he told defense counsel that the jury need to hear the correction to Freeman's testimony, but counsel advised Petitioner, "No, no we are gonna wait." (*id.*). Petitioner states he agreed with counsel's decision not to re-open the case (*id.*). Petitioner contends counsel's failure to move to re-open the case to present Matt Freeman's corrected testimony, or move for mistrial if the court denied the request to re-open the case, was prejudicial (*id.* at 11–12). He argues Freeman's false testimony undermined the credibility of Petitioner's testimony, which was the only evidence that although Petitioner was guilty of DUI prior to the collision, he was not driving at the time of the collision (*id.*).

As with Ground One, *supra*, Respondent does not definitively state whether Petitioner exhausted his state court remedies as to this claim. Respondent concedes (1) Petitioner presented this claim to the state circuit court in his amended Rule 3.850 motion, (2) the circuit court summarily denied it, (3) Petitioner appealed the decision to the First DCA, (4) the First DCA affirmed the lower court's decision, and (5) the state courts adjudicated the claim on the merits (doc. 26 at 23–26). Yet with regard to exhaustion, Respondent argues, "it appears that Petitioner exhausted this claim . . .; however, the State does not waive exhaustion." (*id.* at 26 n.5). Respondent argues the state court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 27).

1.    Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

---

[10] Petitioner mischaracterizes the record. The prosecutor did not make a formal motion to reopen the case; rather, he informed the court and defense counsel that Matt Freeman had discovered an error in his testimony and stated, "I told Trooper Freeman to come in right away in the event we may want to reopen the case and let the Defense or let me present that to the jury if the Defense would like me to do that." (doc. F at 530). The trial judge responded, "If it were simply the State's request to reopen, I wouldn't begin to grant it. So just in case you [defense counsel] were worried that I'm going to grant it on Mr. Rimmer's [the prosecutor's] request." (*id.*). Defense counsel declined to move to reopen the evidence (*id.* at 531).

2.    Federal Review of State Court Decision

Petitioner raised this claim as Claim Three in his amended Rule 3.850 motion (Ex. Y1 at 426–28).  The state circuit court adjudicated the claim as follows:

### 3.  Misadvice Regarding Corrected Testimony

Defendant alleges that his counsel was ineffective for failing to reopen the case to present the trooper's corrected testimony to the jury.  Defendant alleges that he wanted to have the defense case reopened but that counsel advised him to "wait."  Defendant alleges that his waiver of his right to reopen the case was not knowing and intelligent as counsel did not explain to him the implications of doing so.

Defendant testified that he had spoken on the phone with the trooper during his convalescence in Georgia and had informed the trooper that he was not driving at the time of the accident.  The trooper's testimony contradicted Defendant's in that the trooper advised the jury that the men had no such discussions on the telephone or otherwise.  Defendant alleges that this information was relevant to the most important issue in the trial:  whether Defendant was driving the vehicle at the time of the accident.  He alleges that the failure to present these facts to the jury damaged his credibility with the jury.  Defendant also avers that counsel was ineffective for failing to object or move for a mistrial when the trial court denied the State's motion to reopen the case.[FN 18]

> [FN 18]:  Although Defendant alleges that the prosecutor used the false testimony in closing argument, the Court does not find that allegation to be true.  The prosecutor did rely upon the trooper's testimony regarding his conversation, or lack thereof, with Defendant; however, the prosecutor relied solely upon the portions of the trooper's testimony that the trooper had not renounced.  <u>See</u> Attachment 3 at 568–69.

<u>Flawed Advice</u>

Contrary to Defendant's assertions, the trooper's change in testimony was relatively minor.  The trooper did not concede that Defendant had told him that Smith was driving the vehicle at the time of the accident, nor did the trooper change his testimony regarding the fact that he had never spoken to Defendant while Defendant was in Georgia.  The only change in the trooper's testimony, in fact, was that on the day that Defendant was arrested, Defendant had told the trooper about his hitting a mailbox, Smith's offer to repair the mailbox, and Smith's offer to drive.[FN 19]

[FN 19]  <u>See</u> Defendant's Exhibit A at 530.

The Court does not find that the trooper's realization that the men had spoken would have changed the outcome of the case.  At most, the trooper could have confirmed a minor portion of Defendant's story; most of the conflict between the men's testimonies would have remained.  The Court does not find that the trooper's acknowledgement [sic] of a conversation with Defendant at the police station would have changed the jury's verdict as to who was driving the vehicle at the time of the accident.  Therefore, Defendant has failed to show that he was prejudiced by his counsel's advice not to reopen the case, and he is not entitled to relief on this count.

<u>Failure to Object</u>

As to Defendant's allegation that counsel should have objected or moved for a mistrial when the court denied the State's motion to reopen the State [sic] case, the allegation is facially insufficient.  Defendant has failed to allege prejudice. Defendant cannot show that he was prejudiced by the Court's denial of the State's motion to reopen the State [sic] case because the Court gave Defendant the opportunity to reopen the defense case and to present the evidence to the jury. Therefore, Defendant has failed to allege how the inability of the State to reopen their case in any way prejudiced the defense or what prejudice resulted from his trial counsel's failure to object to the Court's ruling.  As Defendant has been given opportunity [sic] to make his claims facially sufficient but has failed to do so with regard to this claim, it is properly denied.

(Ex. AA at 631–33).  Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC).  The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

The record supports the state court's finding that the only change in Matt Freeman's testimony was that on the day Petitioner turned himself in at the jail in Florida, Petitioner told Freeman that prior to the collision he hit a mailbox, Daniel Smith offered to repair the mailbox, and Smith offered to drive (*see* Ex. F at 530).  The corrected testimony would have benefitted the defense, because it would have corroborated Petitioner's testimony that he told Freeman those three facts when he turned himself in.  However, reopening the evidence to introduce Freeman's corrected testimony would not have been without cost to the defense.  Recalling Freeman would have reemphasized the contradictions in Freeman's and Petitioner's testimonies, including (1) whether Petitioner ever spoke to Freeman on the telephone from Georgia, (2) whether Petitioner told

Freeman that after Daniel Smith offered to drive, the two men switched positions, and Smith was driving the Suburban at the time of the collision. Further, the jury's hearing Freeman admit the mistake in his testimony would only have increased his credibility with the jury regarding those aspects of his original testimony that he did not correct, and those aspects were more damaging to Petitioner's case than the mistaken aspects. Petitioner failed to demonstrate that defense counsel's decision not to move to reopen the evidence was a decision that no competent counsel would have made.

With regard to Petitioner's contention that defense counsel was ineffective for failing to object to the trial court's denial of the State's motion to reopen, or move for a mistrial, or both, Petitioner failed to demonstrate he was prejudiced by the court's denial of the State's motion to reopen its case. As the state court found, the trial court provided the defense an opportunity to reopen the defense case and present the evidence to the jury (*see* Ex. F at 530–31). Therefore, Petitioner failed to show that defense counsel's failure to object to the inability of the <u>State</u> to reopen its case prejudiced the defense. Further, because the trial court provided the defense an opportunity to reopen its case to present the corrected testimony, Petitioner failed to show defense counsel had a meritorious basis for seeking a mistrial based upon the trial court's denial of the State's motion to reopen.

Petitioner failed to demonstrate that the state court's adjudication of the issues raised in Ground Three was based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>. Therefore, Petitioner is not entitled to relief on Ground Three.

      D.     <u>Ground Four: "Defense counsel rendered ineffective assistance of counsel by failing to impeach Matt Freeman's false testimony with contrary assertions made in his investigative report and by failing to prepare and call Carol Hall to impeach same.</u>

Petitioner argues defense counsel should have impeached Matt Freeman's testimony, that Petitioner never told him he was not driving the Suburban, with Freeman's investigative report, in which he listed Petitioner as a witness to the identity of the driver of the Suburban (doc. 10 at 7, 12–13). Petitioner contends Freeman's listing him as a witness in his report proves he told Freeman he was not driving the Suburban (*id.* at 13). Petitioner additionally contends defense counsel was

ineffective for failing to call Carol Hall, Petitioner's sister, as a witness to impeach Matt Freeman's credibility (*id.* at 7, 12–13). Petitioner states Ms. Hall would have testified she was standing next to Petitioner when he spoke to Matt Freeman on the telephone in Georgia (*id.* at 12–13). Petitioner asserts Ms. Hall would have also testified that Petitioner advised Freeman he was remembering "bits and pieces" of the events before and during the accident, including, that he backed into a mailbox, heard a man ask if he wanted him (the man) to drive, slid over into the passenger seat, and later saw a white car, grabbed the dash, and was hit (*id.* at 13).

Respondent concedes (1) Petitioner presented this claim to the state circuit court in his amended Rule 3.850 motion, (2) the circuit court summarily denied it, (3) Petitioner appealed the decision to the First DCA, (4) the First DCA affirmed the lower court's decision, and (5) the state courts adjudicated the claim on the merits (doc. 26 at 28–30). Respondent argues, "it appears that Petitioner exhausted this claim . . .; however, the State does not waive exhaustion." (*id.* at 30 n.6). Respondent argues the state court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 31–33).

1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim Four in his amended Rule 3.850 motion (Ex. Y1 at 429–31). In support of his claim, he submitted a copy of page 30 of Trooper Matthew Freeman's Traffic Homicide Report (Ex. V2 at 560–62). He also submitted an affidavit from Ms. Hall (*id.* at 564–65). The state circuit court adjudicated the claim as follows:

**4. Impeachment of Trooper**

In this claim, Defendant alleges that the trooper's report contradicted the testimony the trooper gave at trial. The trooper had testified at trial that Defendant never told him who had been driving the vehicle at the time of the accident. Defendant argues, however, that the trooper's statement in his report that Defendant knew who had been driving the SUV demonstrates that Defendant had to have told him who was driving at the time of the accident. Also, Defendant alleges that his sister, Carol Hall, could have testified that Defendant had actually spoken with the

trooper on the telephone from Georgia and had told him that Defendant had not been driving the vehicle at the time of the accident.

Report

The Court does not find the statement in the report necessarily contradicted the trooper's testimony on the witness stand. Whether or not Defendant had spoken to the trooper and explained that he had not been driving at the time of the accident, the trooper could still have reasonably deduced that Defendant, who had been in the vehicle at the time of the accident, would have had first-hand knowledge as to the driver of the vehicle. Therefore, the Court does not find that counsel was deficient for failing to use the trooper's statement to impeach him on this point at trial, nor does the court find that the outcome of the trial would have been different had counsel attempted to impeach the trooper on this point. This allegation cannot entitle Defendant to relief.

Defendant's Sister

Next. Defendant alleges that counsel should have called Defendant's sister, Carol Hall, to testify to the fact that Defendant had spoken on the telephone with Trooper Freeman and to the content of the conversation. Defendant has failed to show prejudice.

First, testimony as to the content of the telephone conversation "to prove the truth of the matter asserted"[FN 20] would have been hearsay, and Defendant has shown no reason that it would have been admissible at trial. Therefore, the only information that this witness could have provided the jury would have been that she had observed Defendant's speaking on the telephone with the trooper. As noted above, testimony that Defendant had spoken to the trooper would not necessarily have changed the jury's determination regarding the driver on the day of the incidence.

> [FN 20]: See Defendant's motion at 16. The Court notes that Ms. Hall's testimony may have been admissible for the purpose of proving that Defendant had indeed told the officer the things that Defendant claimed to have told the officer. Even if the testimony had been offered for that limited purpose, however, Defendant has failed to show that the testimony would have changed the outcome of the trial because Defendant has not shown that the jury would necessarily have believed the Defendant's version of the facts because of the testimony that he had told the trooper the same story that he had told the jury.

Second, Defendant was able to tell his story to the jury for himself.[FN 21] He has not shown how his sister's testimony that Defendant had telephonic conversations with the trooper would have swayed the jury any more than his own. Defendant's sister would presumably have had the same motive for portraying Defendant in a favorable light as did Defendant himself.

[FN 21]  See Defendant's Exhibit A at 474–76.

Third, as detailed above, Defendant had an opportunity to call the trooper himself back to the stand to acknowledge the mistakes in his testimony, but Defendant decided not to do so.  Therefore, it seems unlikely that Defendant would have insisted on having one witness testify to information to which he had declined to have a second witness testify.  After considering all of these issues, the Court finds that Defendant has proved neither deficiency nor prejudice and cannot be entitled to relief on ground four.

(Ex. AA at 633–35).  Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC).  The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

With regard to defense counsel's failure to impeach Matt Freeman with page 30 of his investigative report, Petitioner failed to show the report had any impeachment value.  Page 30 of the report is a form titled, "Witness List" (Ex. V2 at 562).  It lists Petitioner's name, address, and telephone number, and indicates Petitioner's place of employment as "Unknown" (*id.*).  In the section of the form which states "Can Testify To:," Trooper Freeman wrote "Driver of V-1." (*id.*).  In the section of the form which provides a place to indicate whether the witness provided a statement, Trooper Freeman checked a box indicating "No" (*id.*).  Contrary to Petitioner's assertion that the report proves he told Freeman he was not driving the Suburban, the report does not indicate Petitioner made this statement to Freeman.  Petitioner therefore failed to show defense counsel was deficient in failing to use the report to impeach Freeman's testimony that Petitioner never told him he was not driving the Suburban.

With regard to counsel's failure to impeach Matt Freeman's testimony with Carol Hall's testimony, this court must abide by the state court's interpretation of state law.  *See* Bradshaw v. Richey, 546 U.S. 74, 76, 126 S. Ct. 602, 163 L. Ed. 2d 407 (2005); Mullaney v. Wilbur, 421 U.S. 684, 691, 95 S. Ct. 1881, 44 L. Ed. 2d 508 (1975).  Therefore, this court is bound by the state court's

determination that Ms. Hall's testimony would not have been admissible to the extent it would have been offered to prove the truth of Petitioner's statements to Trooper Freeman during their alleged telephone conversations.

Additionally, even if, as the state court found, defense counsel could have introduced Carol Hall's testimony for the limited purpose of showing that Petitioner did in fact tell Trooper Freeman the same things he told the jury, Petitioner failed to show a reasonable probability Ms. Hall's testimony would have affected the jury's determination that Petitioner was driving the Suburban at the time of the collision. The jury heard in Petitioner's own words that he was not driving the Suburban at the time of the collision, and that he told Trooper Freeman this. Further, although Ms. Hall's testimony would have lessened the impeaching effect of Trooper Freeman's testimony, that Petitioner never told him Smith was actually driving, Petitioner had other credibility issues. In assessing the credibility of witnesses, including Petitioner, the jury was instructed to consider whether the witness seemed to have an accurate memory.[11] Thus, the jury considered Petitioner's

---

[11] In assessing the credibility of witnesses, the jury was instructed to consider the following:

It is up to you to decide what evidence is reliable. You should use your common sense in deciding which is the best evidence, and which evidence should not be relied upon in considering your verdict. You may find some of the evidence not reliable, or less reliable than other evidence.

You should consider how the witnesses acted, as well as what they said. Some things you should consider are:

1. Did the witness seem to have an opportunity to see and know the things about which the witness testified?

2. Did the witness seem to have an accurate memory?

3. Was the witness honest and straightforward in answering the attorneys' questions?

4. Did the witness have some interest in how the case should be decided?

5. Does the witness's testimony agree with the other testimony and other evidence in the case?

6. Has the witness been offered or received any money, preferred treatment, or other benefit in order to get the witness to testify?

8. Did the witness at some other time make a statement that is inconsistent with the testimony [he] [she] gave in court?

It is entirely proper for a lawyer to talk to a witness about what testimony the witness would give if

admitted memory problems, namely, his testimony that he had no recollection of the events leading up to the crash for approximately three months following the crash, and he regained his recollection during nightmares. The jury was also instructed to consider whether the witness had some interest in how the case should be decided, and thus considered the fact that Petitioner had an obvious interest in the outcome of the case. Petitioner also had an obvious interest in telling Trooper Freeman he remembered he was not driving, namely, avoiding prosecution. Additionally, the jury would have assessed Carol Hall's credibility as well, including her interest in the outcome of her brother's trial.

Fairminded jurists could disagree that defense counsel was ineffective for failing to present Carol Hall's testimony. This potential for disagreement precludes federal habeas relief on this issue.

E.     <u>Ground Five: "Defense counsel rendered ineffectiveness [sic] by conceding guilt, advising the jury during opening argument that the Defendant was driving under the influence just prior to the accident, and for advising the Defendant to testify to the same at trial."</u>

Petitioner contends defense counsel performed ineffectively by conceding his guilt during opening statements without Petitioner's consent (doc. 10 at 13–15). Petitioner argues counsel was also ineffective for telling the jury that Petitioner was driving under the influence of alcohol just prior to the accident, and advising Petitioner to testify to this fact (*id.* at 14). Petitioner alleges prior to trial, defense counsel advised him not to take the stand, because the State's case was entirely circumstantial (*id.*). Petitioner states during opening statements, defense counsel told the jury Petitioner was driving under the influence prior to the accident (*id.*). Petitioner asserts when he heard counsel's statement, he knew he would be forced to take the stand, because only his testimony could support counsel's statement (*id.*). Petitioner further asserts at the end of the State's case, defense counsel advised him he needed to take the stand and answer all questions truthfully (*id.* at

---

called to the courtroom. The witness should not be discredited by talking to a lawyer about [his] [her] testimony.

You may rely upon your own conclusion about the witnesses. A juror may believe or disbelieve all or any part of the evidence or the testimony of any witness.

(*see* Ex. F at 513–15 (citing to Florida Standard Jury Instructions in Criminal Cases, No. 3.9 Weighing the Evidence)). Petitioner submitted a copy of the jury instructions (*see* doc. 29, Ex A); however, he omitted the page that included the instructions regarding assessing a witness's credibility.

Case No.: 3:12cv96/MCR/EMT

15). Petitioner contends he took the stand, because he felt he had no choice but to agree with defense counsel's strategy of conceding guilt to the lesser included offense (*id.*).

Respondent asserts the same argument regarding exhaustion as asserted in Grounds One, Three, and Four (doc. 26 at 33–36 & n.7). Respondent argues the state court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 36–37).

        1.      Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

        2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim Five in his amended Rule 3.850 motion (Ex. Y1 at 423–34). The state circuit court adjudicated the claim as follows:

**5. Concession of Guilt**

> Defendant alleges in this ground that counsel was ineffective because, without Defendant's consent, he conceded in opening statement that Defendant was guilty of the lesser-included offense of DUI by advising the jury that Defendant had been driving the vehicle just prior to the accident but, after hitting a mailbox, switched places with the deceased, allowing him to drive.[FN 22] Defendant avers that counsel was ineffective for making the concession and for advising Defendant to testify to those facts on the witness stand. Defendant alleges that absent the concession and Defendant's testimony, the State would have been unable to prove the first element of DUI manslaughter—that Defendant had been driving the vehicle.

> [FN 22]: <u>See</u> Defendant's Exhibit A at 163–64.

> While there is no record of the conversations that Defendant had with his counsel before trial, Defendant avers that his attorney specifically advised him to tell the truth. Counsel cannot be deemed deficient for advising his client to be honest.

> Further, the record is clear that Defendant agreed to the strategy of conceding guilt of DUI, in accordance with his attorney's advice. Although Defendant initially expressed confusion as to the correct decision on this strategy, upon further inquiry, Defendant stated that he wished to pursue the strategy.[FN 23] Therefore, Defendant has not shown that his answers to the Court would have been different had the colloquy regarding the strategy of conceding a lesser-included offense been conducted before opening statements rather than after the close of the State's case.

[FN 23]  <u>See</u> Attachment 3 at 393–96.

Also, defense counsel used Defendant's concession of guilt to Defendant's advantage in closing argument.  He pointed out to the jury that if Defendant was going to lie to "save his hide," why would he not simply deny driving the vehicle at all?  Defense counsel concluded, "I submit to you because it is the truth.  Jimmy just tell them the truth, trust them, trust them, trust the system.  The truth will set you free."[FN 24]   Hence, defense counsel argued the concession to Defendant's advantage, and even were the Court to find that it had been deficient for counsel to make the concession, Defendant has failed to prove that it prejudiced him.  On the contrary, counsel used the concession to strengthen Defendant's position.

[FN 24]  <u>See</u> Attachment 3 at 560.

Additionally, as noted above, much evidence was adduced by the State at trial concerning the aftermath of the accident and Defendant's position in the vehicle.  Defendant has not shown that the outcome of the trial would have been different had he not conceded to driving the vehicle at all and the jury had been left with only the evidence from the accident scene.  Consequently, the Court finds that Defendant has not demonstrated that his attorney's action in any way prejudiced him, and he is not entitled to relief.

(Ex. AA at 635–36).  Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC).  The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

This is not a case where defense counsel conceded Petitioner's guilt to the offenses charged in the information.  Petitioner alleges only, and the record confirms, defense counsel conceded only that Petitioner operated the Suburban under the influence of alcohol and marijuana <u>prior</u> <u>to</u> the collision; counsel did not concede Petitioner was operating the Suburban under the influence when the collision occurred (*see* Ex. F at 160–65).  Therefore, defense counsel's concession did not amount to a guilty plea, and Petitioner's consent to the strategy was not required.  *See* <u>McNeal v. Wainwright</u>, 722 F.2d 674, 676–77 (11th Cir. 1984).  Further, in Petitioner's reply he states he understood that defense counsel intended to present to the jury the theory that at most, the State should have charged Petitioner with DUI (doc. 29 at 35), which suggests Petitioner was aware that

counsel intended to concede Petitioner's guilt to the lesser included offense of DUI.[12] After the State rested its case, Petitioner stated on the record that he agreed with the strategy of conceding guilt to a lesser included offense (Ex. F at 393–96). This strategy was reasonable. It is clear from the trial transcript that the defense strategy was to cast doubt on the State's evidence that Petitioner was driving the Suburban at the time of the collision. The State's case was based entirely upon circumstantial evidence, primarily, photographs and testimony that after the collision, Petitioner's body was partially pinned under the steering wheel with one leg was under the pedals, and Daniel Smith's body was under the passenger's side of the vehicle. The defense attempted to cast doubt on the State's case by presenting expert testimony that the driver at the time of the collision could not be determined from the positions of the bodies after the collision. Petitioner's testimony that he was not driving at the time of the collision was the only direct evidence presented by either side. The truthfulness of Petitioner's testimony that he was not driving at the time of the collision was strengthened by his candor in admitting he was driving prior to the collision, but then switched positions with Mr. Smith after Petitioner hit a mailbox and Smith offered to drive. Defense counsel's strategy of conceding during opening statements that Petitioner drove the vehicle under the influence of alcohol prior to the accident was a reasonable trial strategy.

F.     Ground Six: "Defense counsel rendered ineffective assistance by failing to properly present secondary defense that a third car caused the accident, for failing to depose and call Rebecca Brazier and Dan Owens in support of this defense, and for failing to request a special jury instruction supporting same."

Petitioner asserts his "secondary" defense to the charges was that a third car caused the collision; therefore, Petitioner did not cause or contribute to the death of Daniel Smith (doc. 10 at 16–17). Petitioner asserts according to a deposition of Donna Garrett taken by defense counsel, Ms. Garrett saw a third car cause the accident, and Rebecca Brazier was with Garrett in the bar of the Colonial Inn at the time of the accident (*id.*). Petitioner contends defense counsel should have deposed Rebecca Brazier and presented her testimony that she also saw a third car veer into the highway, causing the Suburban to swerve into oncoming traffic (*id.*). Petitioner contends Brazier's

---

[12] An additional fact that suggests Petitioner knew prior to trial that the jury would become aware of the fact he was driving under the influence prior to the accident is Petitioner's knowledge that he admitted this fact to Trooper Freeman in March of 2006. The admission would have been admissible at trial. *See* Fla. Stat. § 90.803(18).

testimony would have corroborated Garrett's and Petitioner's testimonies (*id.*). Petitioner also contends defense counsel should have deposed Dan Owens (Leslie Cornielle's husband) and presented his testimony (*id.*). Petitioner asserts Leslie Cornielle told law enforcement that her husband heard the squeals from a possible third vehicle (*id.*). Additionally, Petitioner contends that although defense counsel introduced evidence demonstrating that a third car caused the collision, counsel abandoned this defense during closing argument by failing to argue that this evidence related to the third element of DUI manslaughter, that is, the "caused or contributed to the death of" element (*id.*). Petitioner contends defense counsel should have argued this defense to the jury and requested a special jury instruction providing, "If the jury found that a third car caused the accident, such would be sufficient evidence tending to create a reasonable doubt as to whether the Petitioner caused or contributed to the cause of death of Daniel Smith" (*id.*).

Respondent asserts the same argument regarding exhaustion as asserted in Grounds One, Three, Four, and Five (doc. 26 at 37–40 & n.8). Respondent argues the state court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 41).

      1.      Clearly Established Federal Law

The Strickland standard, set forth *supra*, governs this claim.

      2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim Six in his amended Rule 3.850 motion (Ex. Y1 at 435–38). The state circuit court adjudicated the claim as follows:

**6. Secondary Defense**

> In this ground, defendant makes three separate allegations. First, he alleges that counsel should have presented the testimony of Rebecca Brazier and of Dan Owens to the fact that a third car caused the accident in this case. Secondly, he alleges that, although counsel brought forth evidence tending to show that another vehicle had caused the traffic accident, counsel was ineffective for failing to explain to the jury how the existence of the third car affected the crime charged. Thirdly, Defendant alleges that counsel should have requested a special jury instruction informing the jury that, if they found that a third car existed, such a finding would create reasonable doubt regarding Defendant's guilt.

> Rebecca Brazier

In this point, Defendant alleges that Rebecca Brazier was an available witness who would have testified that she was in the bar with Witness Donna Garrett at the time of the accident. Defendant alleges that because Garrett testified that she had seen a third car veer into Defendant's lane, counsel would have been able to elicit the same testimony from Brazier.

It is unclear whether Defendant is alleging that Brazier had definitely seen the car or that she may have seen the car because she was with Witness Garrett. If the latter, the allegation is not facially sufficient. The simple fact that the women were together at the time of the accident does not necessarily mean that they would have seen the same things. Such an allegation would not meet the requirements of a facially sufficient claim of ineffectiveness of counsel for failure to call a witness.

Furthermore, even if the allegation is sufficient as alleged, it still entitles Defendant to no relief. Counsel is not ineffective for failing to call witnesses whose testimony would be merely cumulative. See Darling v. State, 966 So. 2d 366, 378 (Fla. 2007). The information that Defendant alleges would have been elicited from Brazier was already before the jury. In her testimony, Donna Garrett stated that she had seen a car "float" out onto Gulf Beach Highway, accompanied by a screeching of tires, just before the accident.[FN 25] Also, Leslie Cornielle's statement indicated that she had heard a screeching of tires consistent with the existence of a third car, and that she had seen a white, sports-car style automobile pull onto Gulf Beach Highway right in front of Defendant's vehicle.[FN 26] Hence, any testimony elicited from Brazier regarding a third car would have been cumulative of the testimony already on the record.

[FN 25] See Defendant's Exhibit A at 405.

[FN 26] See Defendant's Exhibit A at 416, 424–27.

Additionally, Defendant has not shown prejudice. Even had the jury heard Brazier's testimony and believed that a third car had blocked the path of Defendant's vehicle, the jury could still have found that the driver's intoxication and reactions were contributing factors to the death of Daniel Smith. Hence, a finding that a third vehicle existed would not necessarily have required Defendant's acquittal.

<u>Dan Owens</u>

Defendant also alleges that had counsel deposed Dan Owens and called him as a witness at trial, Owens would have testified that he had heard the squealing wheels of a "possible" third car.

Defendant has failed to show prejudice. Defendant does not allege that Owens had seen a third vehicle or that he would have testified that the squeals that he had heard came from a vehicle exiting the Colonial Inn parking lot into Defendant's lane of traffic. Owens's testimony, therefore, that he had heard a squealing of tires would not necessarily have been helpful to Defendant's case.

Additionally, as with Brazier's testimony, Owens's testimony would have been cumulative of the testimony before the jury from Garrett and Cornielle regarding the existence of a third car. As noted, failure to elicit cumulative testimony does not amount to ineffectiveness of counsel. Consequently, counsel cannot be deemed deficient for failing to call this witness, nor can Defendant be said to have been prejudiced by the lack of this witness's testimony; Defendant is not entitled to relief.

### Explanation to Jury

The existence of a third car would not necessarily have changed the outcome of the trial. As Defendant points out in his motion, in order to be found guilty of DUI manslaughter, the jury had to find that Defendant had been the cause of or had contributed to the death of Daniel Smith. See section 316.193(3)(c)3, Florida Statutes (2005). Therefore, even had counsel made the arguments that Defendant now advocates, as noted above, the jury could still have found the driver to have contributed to the victim's death, and a finding that a third vehicle existed would not necessarily have changed the outcome of the trial. Hence, Defendant cannot show that he was prejudiced by his counsel's failure to explain the third car's significance more thoroughly to the jury.

### Special Jury Instruction

In the same vein, counsel was not ineffective for failing to request an instruction such as Defendant now advances. As explained above, the jury was entitled to find Defendant guilty of the charges even had the jury found a third car to have existed. Therefore, the trial court could not properly have instructed the jury that their finding that a third car came into Defendant's lane would conclusively cast a reasonable doubt on Defendant's guilt. Defendant is not entitled to relief on this claim.

(Ex. AA at 637–39). Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC). The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

With regard to defense counsel's failure to depose and present testimony from Rebecca Brazier and Dan Owens, Petitioner failed to show deficient performance or prejudice. Counsel's decision whether to call a particular witness is a matter of trial strategy entitled to great deference. Chandler v. United States, 218 F.3d 1305, at 1314 n.14 (11th Cir. 2000) (citing Waters v. Thomas, 46 F.3d 1506, 1512, 1518–19 (11th Cir. 1995) (en banc)). If the record is not complete regarding counsel's actions, then the courts should presume "that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some reasonable lawyer might do." Id. at 1314–15 n.15. "The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." Waters, 46 F.3d at 1514. "Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative." Buckelew v. United States, 575 F.2d 515, 521 (5th Cir. 1978).

Initially, Petitioner's allegations regarding the substance of Ms. Brazier's and Mr. Owens's testimony are purely speculative. He offered nothing, in the form of affidavits or otherwise, to show that these witnesses actually would have testified to the facts Petitioner alleges. Additionally, the trial transcript supports the state court's factual finding that testimony from Ms. Brazier that she observed a third car, and testimony from Mr. Owens that he heard squealing tires, would have been cumulative of the testimony of Donna Garrett and Leslie Cornielle. Therefore, Petitioner failed to show he was prejudiced by counsel's failure to depose and present testimony from Brazier and Owens. *See* Price v. Allen, 679 F.3d 1315, 1325 (11th Cir. 2012) (even assuming that defense counsel behaved deficiently during sentencing phase of capital murder trial in failing to interview defendant's family members, friends, and school teachers who could have testified to instances of childhood abuse defendant suffered, defendant failed to show that he was prejudiced, as required to make out ineffective assistance claim, where defendant failed to provide any indication of nature or number of other instances of abuse to which those individuals could have testified, and testimony of those individuals' affection for defendant was largely cumulative of testimony of his mother); Jones v. Sec'y, Dep't of Corr., 644 F.3d 1206, 1212 (11th Cir. 2011) (petitioner failed to make

sufficient showing of prejudice under <u>Strickland</u> where alleged testimony of uncalled witnesses would likely have been cumulative); <u>Parker v. Allen</u>, 565 F.3d 1258, 1283 (11th Cir. 2009) (same).

Petitioner additionally failed to show he is entitled to relief on his claims that defense counsel abandoned the "secondary" defense during closing argument and failed to request the special jury instruction he identified in his petition. The trial transcript refutes Petitioner's assertion as to counsel's closing argument, and demonstrates counsel did in fact argue the third vehicle caused the collision (Ex. F at 557, 559, 562). With regard to the special jury instruction, the trial court determined, as a matter of state law, that the trial court could not have properly instructed the jury that their finding that a third car came into Petitioner's lane would conclusively cast a reasonable doubt on Petitioner's guilt. In light of this determination, Petitioner failed to show that counsel was deficient for failing to request the instruction. Petitioner additionally failed to show prejudice, since there is no reasonable probability the trial court would have properly allowed the special instruction.

Petitioner failed to demonstrate the state court's adjudication of the claims raised in Ground Six were based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to relief.

G. <u>Ground Seven: "Defense counsel rendered ineffectiveness [sic] by failing to object, request a cautionary instruction or preserve for appeal officer's improper opinion as to the credibility of witnesses."</u>

Petitioner contends defense counsel was ineffective for failing to object to Trooper Matt Freeman's testimony that Leslie Cornielle's description of the collision was not as consistent as Charlie McCormick's description (doc. 10 at 18). Petitioner argues Freeman's testimony constituted improper vouching and improper opinion testimony regarding Ms. Cornielle's credibility (*id.*).

Respondent contends Petitioner failed to properly exhaust this claim (doc. 26 at 42–44). Respondent concedes Petitioner raised the claim as Claim Seven in his amended Rule 3.850 motion; however, Petitioner did not present it to the First DCA on appeal of the circuit court's order denying his motion (*id.*). Respondent further contends Petitioner may not properly return to state court to exhaust this claim; therefore, it is procedurally defaulted (*id.*). Notwithstanding the failure to exhaust, Respondent contends the state circuit court's adjudication of Petitioner's claim is entitled to deference (*id.* at 45–48).

In Petitioner's reply, he contends he may have failed to raise the issue in his initial brief on appeal of the circuit court's denial of his motion and thus procedurally defaulted the claim (doc. 29 at 37). He argues, however, he is entitled to federal review, because he has demonstrated a constitutional violation under Strickland, and the federal court's failure to review the claim will result in a fundamental miscarriage of justice (*id.*).

The First DCA, the state court in which Petitioner filed his postconviction appeal, requires an appellant who files a brief when appealing a summarily denied post-conviction motion, to address all arguments in his brief that he wishes to preserve for appellate review. *See* Watson v. State, 975 So. 2d 572, 573 (Fla. 1st DCA 2008); *see also* Cook v. State, 638 So. 2d 134, 135 (Fla. 1st DCA 1994).[13] However, if an appellant does not file a brief when appealing, the appellate court is required to investigate all possible means of relief. *Id.* n.1; *see also* Fla. R. App. P. 9.141(b)(2).

In the instant case, the state court record demonstrates Petitioner raised this claim as Claim Seven in his amended Rule 3.850 motion (Ex. Y1 at 439–40). The state circuit court summarily denied his claim (Ex. AA at 640–41). Petitioner appealed the decision to the First DCA and chose to file an appellate brief (Ex. CC). He did not argue error with respect to the lower court's denial of Claim Seven (*id.*). The First DCA affirmed the circuit court's decision without written opinion (Ex. EE).

As previously discussed, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan, 526 U. S. at 845. In the instant case, Petitioner's initial brief in his post-conviction appeal was filed August 3, 2011, well after Watson was decided and after the law of the Fifth DCA changed. Therefore, to obtain appellate review of the federal claims raised in his summarily denied Rule 3.850 motion, he was required to raise and

---

[13] The Eleventh Circuit held, albeit in an unpublished opinion, that when a Florida defendant does not receive an evidentiary hearing in his Rule 3.850 proceeding and appeals the circuit court's decision denying his motion, he satisfies the federal exhaustion requirement as to all claims raised in his Rule 3.850 motion, even if he files a brief and fails to address each issue in his appellate brief. *See* Darity v. Sec'y, Dep't of Corr., 244 Fed. Appx. 982, 984, 2007 WL 2274618 (11th Cir. 2007) (emphasis added); Cortes v. Gladish, 216 Fed. Appx. 897, 899–900, 2007 WL 412484, at *2 (11th Cir. 2007). However, the Florida case upon which the Eleventh Circuit relied in Darity and Cortes, that is, Webb v. State, 757 So. 2d 608 (Fla. 5th DCA 2000), is no longer the decisional law of the Fifth DCA. *See* Ward v. State, 19 So. 3d 1060, 1061 (Fla. 5th DCA 2009) (en banc).

fully address the merits of those issues in his appellate brief.  *See* <u>Watson</u>, 975 So. 2d at 573.  *Cf.* <u>Daniels v. Sec'y, Dep't of Corr.</u>, No. 6:10cv200-ACC-KRS, 2010 WL 5297167, at *7 (M.D. Fla. Dec. 20, 2010) (recognizing that <u>Webb</u> was receded from in <u>Ward</u>, but holding that <u>Webb</u> was applicable to federal petitioner's claim, because his state post-conviction appeal pre-dated <u>Ward</u>). In Petitioner's appellate brief, he did not raise a substantive argument as to the circuit court's rejection of Claim Seven (Ex. CC).  Petitioner's having chosen to seek appellate review of only some of the claims denied by the circuit court, but not the claim raised in Ground Seven of his federal petition, he failed to invoke the state court's established appellate review process as to his claim and thus did not properly present it to the state court.  *See, e.g.,* <u>Solis v. Tucker</u>, No. 4:10cv3/SPM/CAS, 2012 WL 4478301, at *5 (N.D. Fla. Aug. 29, 2012), *Report and Recommendation Adopted by* 2012 WL 4478782 (N.D. Fla. Sept. 28, 2012); <u>Thompson v. Tucker</u>, No. 5:10cv186/MCR/EMT, 2012 WL 2891272, at *9 (N.D. Fla. June 12, 2012), *Report and Recommendation Adopted by* 2012 WL 2890802 (N.D. Fla. July 16, 2012); <u>Wood v. Tucker</u>, No. 5:10cv200/RS/EMT, 2012 WL 2511428, at *7–8 (N.D. Fla. May 31, 2012), *Report and Recommendation Adopted by* 2012 WL 2511323 (N.D. Fla. June 29, 2012); <u>Green v. McNeil</u>, No. 1:09cv204/MMP/GRJ, 2011 WL 2790167, at *7 (N.D. Fla. June 22, 2011), *Report and Recommendation Adopted by* 2011 WL 2790180 (N.D. Fla. July 15, 2011).

Any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine, because a second appeal is unavailable, and any further attempt to raise the claims in another Rule 3.850 motion would be subject to dismissal as successive.  *See* Fla. R. Crim. P. 3.850(f).  Therefore, Ground Seven is procedurally defaulted.

As discussed *supra*, to overcome a procedural default such that this court may consider the merits of his claims, Petitioner must show cause for the default and prejudice resulting therefrom or a fundamental miscarriage of justice.  <u>Tower</u>, 7 F.3d at 210; <u>Parker</u>, 876 F.2d 1470.  Petitioner has not alleged cause for his default; nor has he shown he is entitled to review of his claim through the "fundamental miscarriage of justice" exception to the procedural bar, because he has not alleged the existence of new reliable evidence in light of which it is more likely than not no reasonable juror would have convicted him.  Therefore, Ground Seven is procedurally barred from federal review.

H.     Ground Eight:  "Defense counsel rendered ineffectiveness [sic] by failing to
challenge medical records and toxicology report and for stipulating and advising Defendant
to stipulate to jury contents of report where such should have been suppressed prior to trial,
or could have found [sic] untrustworthy at trial."

Petitioner asserts prior to trial, the State notified the defense that it intended to introduce a

lab report from Baptist Hospital dated December 12, 2005, stating on that date at 18:35 hours,

Petitioner had an ethanol level of .228 per 10 mg/dl, and at 18:10 hours, Petitioner's urine indicated

the presence of cannabinoid (doc. 10 at 19–21).  Petitioner argues defense counsel should have

challenged the admissibility of the report, instead of stipulating to its admission (*id.*).  As grounds

for challenging the admissibility of the report, Petitioner asserts his medical records demonstrated

urine was not collected from him at 18:10 hours, because his records show he was extricated from

the vehicle and intubated by paramedics at 18:10, with intubation completed at 18:11, and there is

no indication urine was collected at that time (*id.*).  Further, his records from Baptist Hospital show

he arrived at the hospital at 18:24 hours, and no lab work or screens were done (*id.*).  He therefore

contends counsel should have challenged the reports as untrustworthy and unreliable because (1)

Petitioner's medical records indicated the times on the toxicology report were false, (2) the

toxicology report contained language that it was not intended for legal use because the lab was not

NIDA certified, (3) the report did not demonstrate that the ethanol results were based upon testing

100 milliliters of blood, and (4) the State failed to establish the prerequisites for admission of the

test results pursuant to Florida's implied consent law (*id.*).  Petitioner additionally contends defense

counsel should have moved to suppress "other medical records" indicating Petitioner had admitted

to drinking a dozen cans of beer per day (*id.* at 21).

Respondent asserts the same argument regarding exhaustion as asserted in Grounds One,

Three, Four, Five, and Six (doc. 26 at 48–53 & n.10).  Respondent argues the state court's

conclusion as to the admissibility of the toxicology reports under Florida law is binding on this

federal court (*id.* at 54).  In light of this conclusion, the court' adjudication of Petitioner's claim was

not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable

application of clearly established federal law (*id.* at 54–55).

1.     Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

2.      Federal Review of State Court Decision

Petitioner raised this claim as Claim Eight in his amended Rule 3.850 motion (Ex. Y1 at 441–45).  The state circuit court adjudicated the claim as follows:

**8.  Motion to Suppress**

Next, Defendant alleges that counsel should have moved to suppress the toxicology report rather than advising Defendant to stipulate to it.  Defendant alleges that the report was "untrustworthy" because the times on the report were false, the report was not intended for use in legal proceedings, the results may not have been based on the 100 milliliter standard required by statute, and the State was unable to meet the burden of proof for admissibility of the report.  Defendant alleges that without the stipulation, the State could not have met their burden of proof regarding the second element of DUI manslaughter.  Defendant also alleges that counsel should have moved to suppress "other medical records" indicating that Defendant had admitted to drinking a dozen cans of beer per day.

Trial Strategy

The Court would first note that Defendant's version of the facts was that he was a passenger, not the driver.  There is no law prohibiting drunkenness of a passenger of a motor vehicle.  Therefore, the state of Defendant's blood alcohol level was of no consequence to the case.  Hence, the jury based their decision not on whether Defendant had been drunk, but on whether Defendant was the driver of the vehicle.  Defendant has not given the Court any reason to believe that the outcome of the trial would have been different had counsel not advised Defendant to stipulate to the toxicology report.

The Court also notes that counsel's strategy at trial was one of transparency as shown by his arguments in closing.[FN 30]  It was therefore a reasonable tactical decision to stipulate to the amount of alcohol in Defendant's system to show the jury that Defendant was being completely transparent about the events on the night of the accident.  "Strategic decisions that are reasonable under the norms of professional conduct do not constitute the ineffective assistance of counsel."  Bonner v. State, 981 So. 2d 499, 502 (Fla. 3d DCA 2008).  This Court does not find that counsel's advice, then, was in any way deficient.

[FN 30]  See Attachment 3 at 560.

Suppression

"[W]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove that his Fourth Amendment claim is meritorious." McDonald v. State, 952 So. 2d 484, 497 (Fla. 2006).

*Untrustworthy Report*

Defendant alleges that the toxicology report was untrustworthy because it contained false time signatures, was not intended for legal use, and did not indicate that the blood was tested according to statutory standards.

First, Defendant states that the time signatures on the toxicology report are false because the report indicates that the blood alcohol was measured at 18:35, but Defendant points out that the emergency room records state that blood was drawn at 18:30 not 18:35. Defendant also alleges that the reports state the urine was taken at 18:10, but that no urine could have been taken at that time because Defendant was being extricated from the vehicle and intubated from 18:10 to 18:11.

Even in light of the discrepancies in the times noted on the reports, the Court does not find that Defendant was prejudiced. Defendant does not argue that blood or urine specimens were not taken; rather, he argues that the times listed on the laboratory reports were erroneous. The testimony at trial was undisputed that medical staff had drawn blood from Defendant shortly after the accident and that the blood was later tested for alcohol content.[FN 31]. Defendant has not shown that a discrepancy in documentation regrading the time the samples were taken in any way makes the results of the toxicology report unreliable. Defendant also fails to allege that the laboratory could not have corrected the erroneous time signatures based on the extensive and detailed notations in Defendant's medical records from the hospital.[FN 32] Defendant has failed to show that the incorrect times noted on the toxicology report were anything more than scrivener's errors, and the Court does not find that such scrivener's errors would have required suppression of the report.

[FN 31] See Attachment 3 at 308–309.

[FN 32] See Defendant's Exhibit I. "Foley" was begun at 18:36 with an internal output of approximately 200 milliliters. The Court notes that Merriam Webster's online medical dictionary indicates that a Foley Catheter is a "catheter with an inflatable balloon tip for retention in the bladder." http://www.merriam-webster.com/medical/foley?show=0&t=1308 777807 (June 22, 2011).

Secondly, Defendant alleges that the tests were not legally satisfactory. Again, Defendant has failed to show prejudice. Defendant has shown no reason that the State could not have requested a full-scale test by a certified laboratory on the specimens taken at the hospital and subsequently presented those results at trial in order to prove Defendant's intoxication level at the time of the accident. Defendant does not dispute that his blood contained more than the legal limit of alcohol or that marijuana was in his system at the time of the accident. Defendant has not alleged, nor can he in good faith allege, that a laboratory test at a NIDA certified laboratory, using statutorily required criteria, would have inflicted that his blood did not contain a blood alcohol level exceeding the legal limit or that his system did not contain marijuana. Therefore, this claim cannot entitle Defendant to relief.

*Burden of Proof*

Next, Defendant alleges that the State could not have met the standards for admissibility of the toxicology report. Therefore, had his counsel moved for suppression of the report, the Court would have granted the motion.

"[T]he failure to adhere to the implied consent law and its related regulations did not render blood-test results inadmissible where blood was drawn for an exclusively medical purpose. This is true even though the blood or test results later are seized and used as evidence in a DUI-related prosecution." Robertson v. State, 604 So. 2d 783, 790–791 (Fla. 1992). To meet the admissibility requirements, the State must adduce proof that "establishes the reliability of the test, the qualifications of the operator, and the meaning of the test results by expert testimony." Id. at 790, quoting State v. Bender, 382 So. 2d 697, 700 (Fla. 1980).

The medical records attached to the instant motion indicate that blood was drawn by medical personnel for "labs" done at the time of Defendant's admission to the hospital.[FN 33] Under Robertson, the results would have been admissible at trial as long as the proper criteria had been met. Defendant has failed to show that an expert could not have been procured to testify to "the reliability of the test, [the tester's] qualifications, and whether the equipment was used . . .[as well as] the meaning of the test results." Robertson, 604 So. 2d at 792. Therefore, Defendant has failed to show that a motion to suppress the toxicology report would have been successful had it been made; hence, Defendant has failed to show prejudice.

[FN 33] See Defendant's exhibit I. See also Attachment 5, Orders for Treatment. Even had the blood been drawn for legal as well as medical purposes, Defendant has not shown that the results of an ensuing test would have been inadmissible at trial. See Lawlor v. State, 538 So. 2d86 (Fla. 1st DCA 1989). See also State v. Serrago,

875 So. 2d 815 (Fla. 2d DCA 2004) and <u>State v. Tronolone</u>, 532 So. 2d 1127 (Fla. 3d DCA 1988).

Also, as noted above, even had the Court disallowed the hospital toxicology report, Defendant has shown no reason that the State could not have requested a supplemental test of the blood drawn at the hospital for admission at trial. Consequently, this allegation can entitle Defendant to no relief.

*Other Medical Records*

Defendant finally avers that his counsel was ineffective for failing to move to suppress other unreliable medical records that indicated that Defendant had admitted to drinking twelve cans of beer per day. This allegation is insufficient. Neither the documents to which Defendant refers nor the information that Defendant had admitted to drinking heavily were introduced at trial. Defendant cannot show how his counsel's failure to move to suppress documents and information that were not introduced at trial could possibly have prejudiced him. This allegation cannot entitle him to relief.

(Ex. AA at 641–44). Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC). The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

This federal court must defer to the state court's determination that a challenge to admission of the toxicology report on the grounds suggested by Petitioner, that is (1) the times on the toxicology report were false, (2) the report contained language that it was not intended for legal use because the lab was not NIDA certified, (3) the report did not demonstrate that the ethanol results were based upon testing 100 milliliters of blood, and (4) the State failed to establish the prerequisites for admission of the test results pursuant to Florida's implied consent law, would not have been successful under Florida law. In light of this determination, counsel's failure to challenge admission of the report was not unreasonable. Further, in light of the court's conclusion that the State could have corrected any deficiencies in the report (by verifying the times the blood and urine were drawn, having the blood and urine re-tested at an NIDA lab, and using statutorily required criteria) and successfully sought admission of the supplemental results, Petitioner failed to demonstrate a reasonable probability the result of his trial would have been different if defense counsel had challenged the admissibility of the toxicology report.

Additionally, Petitioner failed to show ineffective assistance with regard to defense counsel's failure to seek suppression of Petitioner's medical records that indicated Petitioner admitted he drank twelve cans of beer per day. The state court found as fact that neither the documents to which Petitioner referred nor the information that Petitioner had admitted to drinking heavily were introduced at trial. Petitioner has not rebutted this finding with clear and convincing evidence; therefore, this fact is presumed correct. In light of the fact that this information was not admitted at trial, Petitioner failed to demonstrate he was prejudiced by counsel's failure to seek suppression of the information.

Petitioner failed to demonstrate the state court's adjudication of the claims raised in Ground Eight were based upon an unreasonable determination of the facts, or contrary to or an unreasonable application of <u>Strickland</u>. Therefore, he is not entitled to relief.

     I.    <u>Ground Eleven: "Defense counsel rendered ineffective assistance of counsel by failing to move for mistrial and object to prosecutor's improper closing arguments which deprived Defendant of a fair and impartial jury trial."</u>

Petitioner asserts defense counsel should have objected to several comments of the prosecutor during closing argument and moved for a mistrial (doc. 10 at 21–24). First, the prosecutor inflamed the passions of the jury by referring to Daniel Smith as a "dead man" (*id.* at 22). Second, the prosecutor improperly bolstered testimony of Johnny Freeman and Leslie Cornielle by stating that their testimony was consistent (*id.*). Additionally, the prosecutor improperly bolstered Matt Freeman's testimony by arguing that the defense expert did not contradict Freeman's homicide report (*id.*). The prosecutor also improperly bolstered Matt Freeman's testimony by arguing Freeman conducted a thorough investigation and did not rush to judgment (*id.* at 23). Third, the prosecutor improperly characterized the evidence by arguing that the photographs and testimony of Daniel Smith's injuries described by the medical examiner were consistent with Petitioner driving the vehicle at the time of the collision (*id.*). Fourth, the prosecutor improperly suggested the State only arrests and charges persons who are guilty (*id.*). Finally, the prosecutor improperly expressed his personal opinion that Petitioner was guilty (*id.* at 24).

Respondent asserts the same argument regarding exhaustion as asserted in Grounds One, Three, Four, Five, Six, and Eight (doc. 26 at 55–61 & n.11). Respondent argues the state court's

conclusion as to the propriety of the prosecutor's comments during closing arguments under Florida law is binding on this federal court (*id.* at 61). In light of this conclusion, the court's adjudication of Petitioner's claim was not based upon an unreasonable determination of the facts, nor was it contrary to or an unreasonable application of clearly established federal law (*id.* at 61–62).

       1.     Clearly Established Federal Law

The <u>Strickland</u> standard, set forth *supra*, governs this claim.

       2.     Federal Review of State Court Decision

Petitioner raised this claim as Claim Eleven in his amended Rule 3.850 motion (Ex. Z at 618–23). The state circuit court adjudicated the claim as follows:

**11. Prosecutor's Closing Arguments**

In the allegation contained in his supplement, Defendant contends that his attorney was ineffective for failing to object to the improper statements in the prosecutor's closing arguments. Defendant alleges that the prosecutor "made comments which inflamed the minds and passions of the jurors, introduced argument which tended to cloak the State's case with legitimacy, bolstered and vouched for the credibility of the police officers, misstated the evidence, gave a personal opinion of guilt, and implied that the state only arrests those who do wrong."

In order to be successful in an allegation that counsel was ineffective for failing to object to a prosecutor's improper arguments, Defendant must show two things:

[F]irst . . . that the comments were improper or objectionable and that there was no tactical reason for failing to object. Secondly, . . . that the comments deprived the defendant of a fair and impartial trial, materially contributed to the conviction, were so harmful or fundamentally tainted as to require a new trial, or were so inflammatory that they might have influenced the jury to reach a more severe verdict than that it would have otherwise.

<u>Stephens v. State</u>, 975 So. 2d 405, 420 (Fla. 2007) (internal quotation omitted). Therefore, this court must determine whether the comments to which Defendant objects were improper.

<u>"Dead Man"</u>

First, Defendant contends that his counsel should have objected to the prosecutor's use of the term "dead man" with respect to the deceased because the reference inflamed the passions of the jury.[FN 48]  The Court finds that the prosecutor's accurate statement that one of the occupants of the vehicle was dead at the scene was merely a restatement of the evidence in the case.  The Court does not find anything inflammatory or unduly prejudicial in the prosecutor's choice of the term "dead man;" therefore, counsel was not deficient for failure to object to the term.

[FN 48]  See Defendant's Exhibit A at 552.

### Trooper's Credibility

Second, Defendant avers that the prosecutor bolstered the officers' credibility by indicating that the testimonies of Trooper Johnny Freeman and Witness Cornielle were consistent with each other, by pointing out that the trooper's report did not conflict with the report of the accident reconstructionist, by stating that the trooper did a thorough investigation and "did not rush to judgement," and by arguing that the troopers did what they could to find the unidentified vehicle.  Defendant also avers that these statements imply that the troopers had determined prior to trial that Defendant was guilty.

"Improper bolstering occurs when the State places the prestige of the government behind the witness or indicates that information not presented to the jury supports the witness's testimony."  Spann v. State, 985 So. 2d 1059, 1067 (Fla. 2008).  However, a prosecutor does not engage in improper bolstering when he merely points out that a witness's testimony may be believed because it is corroborated by other evidence.  See Yok v. State, 891 So. 2d 602, 603 (Fla. 1st DCA 2005) ("[T]he prosecutor's isolated comment simply urged the jury to find the victim honest and straightforward 'on the state of the evidence' before it."); and Johnson v. State, 858 So. 2d 1274, 1276–77 (Fla. 3d DCA 2003) (holding that the prosecutor's statements in closing argument were not improper where the prosecutor "simply pointed out that, given the facts at hand, it was unlikely . . . that the officers' testimony . . . [was] untrue.").

The prosecutor's statement here that the testimony from the various witnesses was consistent with the other testimony and evidence adduced at trial was not an improper bolstering of the credibility of any of the witnesses.  Rather, it was a proper reiteration and explication of the evidence for the sake of the jury.  The evidence at trial was undisputed that the troopers had issued a press release to help in locating the unidentified vehicle,[FN .49] had re-interviewed a key witness,[FN 50] and had taken months to close the investigation.[FN 51]

[FN 49]  <u>See</u> Attachment 3 at 364–65.

[FN 50]  <u>See</u> Defendant's Exhibit A at 415–36.

[FN 51]  <u>See</u> Attachment 3 at 280.

<u>Misrepresentation of Evidence</u>

Also, Defendant alleges that the prosecutor misrepresented the evidence when he stated that the pictures and the men's injuries indicated that Defendant had been the driver of the vehicle at the time of the accident.  Specifically, Defendant challenges the prosecutor's arguments that "the photographs show [Defendant] was driving," that "Dr. Minyard testified that Mr. Smith had 12 injuries on the right side . . . which I submit to you are consistent with him being on the passenger side," and that "[Defendant's] right side injuries would be consistent with him being the driver."  Defendant contends that no witness testified to any of these statements; therefore, they were improper for the State to make in closing argument.

"With regard to closing arguments, this Court emphasized in <u>Bertolotti v. State</u>, 476 So. 2d 130, 134 (Fla. 1985), that "[t]he proper exercise of closing argument is to review the evidence and explicate those inferences which may reasonably be drawn from the evidence."  <u>Gonzalez v. State</u>, 990 So. 2d 1017, 1028–1029 (Fla. 2008).  <u>See</u> also <u>Dessaure v. State</u>, 891 So. 2d 455, 468 (Fla. 2004) (recognizing that "[c]losing argument presents an opportunity for both the State and the defendant to argue all reasonable inferences that might be drawn from the evidence").

The Court does not find that the prosecutor's review of the evidence was in any way misleading or a "misrepresentation."  Rather, the challenged statements were reasonable deductions that could be made from the evidence as presented at trial. Arguing reasonable inferences from the presented evidence is proper in closing arguments. Nothing in these statements should have made defense counsel object to the prosecutor's arguments, and counsel cannot be deemed deficient for failing to make a non-meritorious objection.

<u>Wrongfulness Argument</u>

Next, Defendant avers that the following statements from the prosecutor were improper:  1) "if wrongdoers are not arrested then law and order will be destroyed," 2) "it is right to arrest those who do wrong and DUI manslaughter is wrong," 3) Defendant "drove a vehicle while . . . under the influence . . . was involved in an accident" and caused the death of Daniel Smith, and 4) it was the jury's job to "right that wrong."  Defendant argues that all of these statements implied that police

officers only arrest guilty parties and that the troopers and the prosecutor were of the opinion that Defendant was guilty.

The statements to which Defendant refers are found in the State's rebuttal argument:

> In his opening statement or argument[FN 52] a few moments ago the Defense attorney said the power to arrest is the power to destroy. I submit to you, ladies and gentlemen, if wrongdoers are not arrested then law and order will be destroyed. It is right to arrest those who do wrong and DUI manslaughter is wrong.[FN 53]
> . . . .
> The Defense Attorney said there is no greater duty than to right a wrong. I agree there is no greater duty than to right a wrong and on December the 12th 2005 [Defendant] did something wrong. He drove a vehicle while he was under the influence, he was involved in an accident and he contributed, he caused or contributed to the death of Daniel Smith and that is wrong. It is up to you to right that wrong. Thank you very much.[FN 54]

This statement was in direct response to defense counsel's argument only a few moments earlier, stating,

> There is no higher calling then [sic] to right a wrong. On behalf of Jimmy Coleson, on behalf of Reed Ammon, myself, I would like to thank you for your time and attention in considering this case. I'm a little nervous. It is such an important case. I have been a lawyer for 20 years. I feel like I have worked my whole career for this moment. The government, the State has power. The power to arrest is the power to destroy. But our forefathers realized that power and in their wisdom the people should be a buffer between the power of the State and the citizen. It is no accident that you are here.[FN 55]

[FN 52]  The Court notes that defense counsel's statement was actually made in closing argument rather than in opening statement as the prosecutor indicated. <u>See</u> Attachment 3 at 554.

[FN 53]  <u>See</u> Attachment 3 at 563.

[FN 54]  <u>See</u> Attachment 3 at 570–71.

[FN 55: <u>See</u> Attachment 3 at 554. The Court notes that it seems words have been omitted from the second to last sentence in the quotation. It is unclear whether the omission was a misstatement by the attorney or a transcription error; however, the Court does not find that the omitted words change the analysis.]

Prosecutorial arguments that simply respond to an argument made by defense counsel in closing argument are not improper. <u>See</u> <u>Walls v. State</u>, 926 So.2d 1156, 1166 (Fla. 2006) ("prosecutor's comments are not improper where they fall into the category of an 'invited response' by the preceding argument of defense counsel concerning the same subject"). In this case, the prosecutor's arguments regarding arrest, law and order, the wrongfulness of DUI manslaughter, and the jury's duty to "right that wrong" were all directly invited by the closing argument advanced by defense counsel. The argument that Defendant had done something wrong by driving under the influence and causing the death of the victim represented a reasonable inference that the prosecutor wished for the jury to draw from the evidence. There was nothing improper, therefore, about any of the challenged arguments, and defense counsel was not ineffective for failing to object.

As the Court has not found that the prosecutor's statements in closing argument were in any way improper, Defendant has failed to show that his counsel was deficient for failing to object to them. Furthermore, Defendant has failed to show that "the comments deprived [him] of a fair and impartial trial." <u>Stephens</u>, <u>supra</u>. Consequently, Defendant is not entitled to relief.

(Ex. AA at 649–54). Petitioner appealed the decision to the First DCA and argued this issue in his brief (Ex. CC). The appellate court affirmed the lower court's decision without written opinion (Ex. EE).

To assess whether defense counsel performed unreasonably by failing to object to statements by the prosecutor or move for a mistrial, the court must determine whether counsel had a meritorious basis for doing so. Under Florida law, the standard for reviewing prosecutorial comments is the following:

Wide latitude is permitted in arguing to a jury. Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments. The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown. A new trial should be granted when it is "reasonably evident that the remarks might have influenced the jury to reach a more severe verdict of guilt than it would have otherwise done." Each case must be considered on its own merits, however, and within the circumstances surrounding the complained-of remarks.

Breedlove v. State, 413 So. 2d 1, 8 (Fla. 1982) (quoting Darden v. State, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted).  The prosecutor may not, however, "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'"  Jones v. State, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting Bertolotti v. State, 476 So. 2d 130 (Fla.1985)). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution.  A prosecutor may argue both facts in evidence and reasonable inferences from those facts.  *See* Tucker v. Kemp, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted).  But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper.  *Id.* at 1507.  Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence.  *See* United States v. Simon, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

Further, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence. United States v. Johns, 734 F.2d 657, 663 (11th Cir. 1984).  A prosecutor may comment on the uncontradicted or uncontroverted nature of the evidence and may point out that there is an absence of evidence on a certain issue during closing argument to the jury.  *See* White v. State, 377 So. 2d 1149 (Fla. 1980).  Additionally, prosecutorial comment upon a general lack of defense evidence is permissible.  *See* Smiley v. State, 395 So. 2d 235 (Fla. 1st DCA 1981).

Attempts to bolster a witness by vouching for his or her credibility are improper "if the jury could reasonably believe that the prosecutor indicated a personal belief in the witness' credibility." United States v. Eyster, 948 F.2d 1196, 1206 (11th Cir. 1991) (citing United States v. Sims, 719 F.2d 375, 377 (11th Cir. 1983)).  A jury could believe that the prosecutor personally believed in the witness' credibility "if the prosecutor either places the prestige of the government behind the witness, by making explicit personal assurances of the witness' veracity, or the prosecutor implicitly vouches for the witness' veracity by indicating that information not presented to the jury supports the testimony."  *Id.* (citation omitted).  Thus, the court must examine whether (1) the prosecutor explicitly personally assured the witness' credibility, or (2) the prosecutor implicitly vouched for

the witness' credibility by implying that evidence not presented to the jury supports the witness' testimony.  United States v. Castro, 89 F.3d 1443, 1457 (11th Cir. 1996) (citing Sims, 719 F.2d at 377).

However, it should be noted that "[t]he prohibition against vouching does not forbid prosecutors from arguing credibility . . . it forbids arguing credibility based on the reputation of the government office or on evidence not before the jury."  United States v. Hernandez, 921 F.2d 1569, 1573 (11th Cir. 1991).  Furthermore, when the prosecutor voices a personal opinion but indicates this belief is based on evidence in the record, the comment is not improper.  United States v. Granville, 716 F.2d 819, 822 (11th Cir. 1983) (finding no prosecutorial misconduct where prosecutor, in effort to support testimony of two government witnesses, only pointed to matters in evidence: the demeanor of one witness and testimony of support witnesses, as well as a tape recording corroborating the testimony of another) (citations omitted).  Likewise, a prosecutor may reply to remarks, comments or assertions made by defense counsel.  See United States v. Young, 470 U.S. 1, 11–13, 105 S. Ct. 1038, 84 L. Ed.2 d 1 (1985) (when prosecutor's comments are an "invited reply" in response to defense counsel's own remarks, and he "[does] no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction") (citations omitted).

Finally, "the limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law."  Houston v. Estelle, 569 F.2d 372, 380 (5th Cir. 1978).  "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 2471, 91 L. Ed. 2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:  (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair.  See Eyster, 948 F.2d at 1206 (citations omitted); Brooks v. Kemp, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), vacated on other grounds, 478 U.S. 1016, 106 S. Ct. 3325, 92 L. Ed. 2d 732 (1986), reinstated, 809 F.2d 700 (11th Cir. 1987); Dessaure v. State, 891 So. 2d 455, 464–65 (Fla. 2004)

(an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial).

Upon review of the evidence adduced at trial and the entirety of the arguments of the prosecutor and defense counsel during closing arguments (Ex. F at 543–71), the undersigned concludes—as did the state circuit court and the First DCA—that Petitioner failed to show that defense counsel's failure to object to the comments identified by Petitioner constituted deficient performance, or that there is a reasonable probability the outcome of trial would have been different if counsel had objected or moved for a mistrial or both. Therefore, the state court's adjudication of Petitioner's claim was not an unreasonable application of <u>Strickland</u>.

V.  CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. Rule 11(b), Rules Governing Section 2254 Cases.

The undersigned finds no substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2); <u>Slack v. McDaniel</u>, 529 U.S. 473, 483–84, 120 S. Ct. 1595, 1603–04, 146 L. Ed. 2d 542 (2000) (explaining how to satisfy this showing) (citation omitted). Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of new Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is **ORDERED**:

The clerk of court is directed to change the docket to reflect that Michael D. Crews is substituted for Kenneth S. Tucker as Respondent.

And it is respectfully **RECOMMENDED**:

1.  That the amended petition for writ of habeas corpus (doc. 10) be **DENIED**.

2.  That a certificate of appealability be **DENIED**.

Case No.:  3:12cv96/MCR/EMT

At Pensacola, Florida, this <u>4</u><sup>th</sup> day of February 2013.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M.  TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

<u>**NOTICE TO THE PARTIES**</u>

        **Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).**